UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

NANCY OLIVIERI, CARLOS J. MIRANDA, THEIR
CONJUGAL PARTNERSHIP, and minors CARLOS,
CALEB, ISAI, LEMUEL, and KEMUEL MIRANDA
OLIVIERI,

       Plaintiffs,

       v.

ABBOTT LABORATORIES, its subsidiary
ABBOTT JAYUYA OPERATIONS, JOHN DOE,
RICHARD DOE, ABC INSURANCE, and XYZ
INSURANCE,

       Defendants.

**CIVIL NO. 05-1244 (ADC/BJM)**

## MAGISTRATE JUDGES REPORT AND RECOMMENDATION
## RE: RULE 56 MOTION FOR SUMMARY JUDGMENT

## PROCEDURAL BACKGROUND

Plaintiffs Nancy Olivieri ("Olivieri"), Carlos J. Miranda, their conjugal partnership, and minors

Carlos, Caleb, Isai, Lemuel, and Kemuel Miranda Olivieri (collectively, "plaintiffs") filed a complaint

against defendants Abbott Laboratories and Abbott Jayuya Operations ("defendants") for discrimination

based on disability and religious affiliation.  (Docket No. 1).  Plaintiffs' claims arise under the

Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*, Title VII of the Civil

Right Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*, and the following Puerto Rico laws: Law

No. 80 of May 30, 1976, 29 L.P.R.A. § 185a *et seq.* ("Law 80"); Law No. 44 of July 2, 1985, 1 L.P.R.A.

§ 501 *et seq.* ("Law 44"); Law No. 100 of June 30, 1959, 29 L.P.R.A. 146 *et seq.* ("Law 100"); and

Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5141 and 5142.

Before the court is Abbott Laboratories' ("Abbott") Motion for Summary Judgment on the

federal and state law claims (Docket No. 10), plaintiffs' opposition (Docket No. 16), and Abbott's reply

(Docket No. 25). The case was assigned to me for a report and recommendation pursuant to 28 U.S.C.

§ 636(b)(1). (Docket No. 42). For the reasons that follow, I recommend that Abbott's motion be

**granted** in part and **denied** in part.

## STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories,

and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any

material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).

A fact is material only if it "might affect the outcome of the suit under the governing law." Anderson

v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In determining if an issue as to a material fact is

"genuine," the court does not weigh the facts but instead ascertains whether the "evidence is such that

a reasonable jury could return a verdict for the nonmoving party." Id.; Leary v. Dalton, 58 F.3d 748,

751 (1st Cir. 1995).

"[A] party seeking summary judgment always bears the initial responsibility of informing the

district court of the basis for its motion, and identifying those portions of the [evidence] ... which it

believes demonstrate the absence of a genuine issue of material fact." Crawford-El v. Britton, 523 U.S.

574, 600 n.22 (1998), quoting Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once this threshold

is met, the burden shifts to the nonmoving party. The nonmovant may not rest on mere conclusory

allegations or wholesale denials. Fed.R.Civ.P. 56(e); Libertad v. Welch, 53 F.3d 428, 435 (1st Cir.

1995). Instead, the nonmoving party must "set forth specific facts showing that there is a genuine issue

for trial." Fed.R.Civ.P. 56(e). The nonmovant "must do more than simply show that there is some

metaphysical doubt as to the material facts." Matsuchita Elec. Indus. Co. v. Zenith Radio Corp., 475

U.S. 574, 586 (1986).  Of course, the court draws inferences and evaluates facts "in the light most

favorable to the nonmoving party." Leary, 58 F.3d at 751.  Still, even in discrimination cases, summary

judgment is appropriate where the nonmoving party rests entirely upon "conclusory allegations,

improbable inferences, and unsupported speculation" on any essential element of the claim.  Medina-

Muñoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990).  "Supporting and opposing

affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in

evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated

therein."  Fed. R. Civ. P. 56(e).

## SUMMARY OF RELEVANT FACTS

The evidentiary record, when viewed in the light most favorable to plaintiffs, admits of the

following facts.

Nancy Olivieri began working at Abbott[1] in Jayuya on July 7, 1987, as a chemist,[2] and by 1990

had developed recurrent laryngotracheal bronchitis related to her exposure to chemicals in her

employer's laboratory.  (Docket No. 17, Exh. 6, ¶¶ 2-3).  Her condition was not permanent in nature.

(Docket No. 10, Exh. I, p. 69-70).  Rather, it arose whenever she was exposed to strong fumes from

certain chemicals.  Id. at p. 69.  The symptoms of her condition included irritation of the respiratory

system and difficulty breathing.  Id. at p. 68.  Olivieri's condition affected her at home in that she could

---

[1] When Olivieri began working at the laboratory, it was called Boots Pharmaceuticals.  Boots Pharmaceuticals was
subsequently acquired by BASF Pharmaceutical, which was acquired by Abbott Laboratories in 2001.  (Docket 10,
Exh. II, ¶¶ 3-4; Docket No. 10, Brief, p,1).

[2] Her title was subsequently changed to "laboratory technician" in 2001 when her laboratory was acquired by Abbott.
(See Docket No. 10, Exh. 1, p. 24, 43).

not clean the bathroom, but she could perform other household tasks that did not involve exposure to chemicals such as taking care of her children, taking them to school, driving, sweeping, mopping, dishwashing, and washing clothes. Id. at p. 78-80. Her condition affected her at work in that she could no longer perform tasks where she was directly exposed to certain chemicals; otherwise, she could perform all of her regular tasks. Id. at p. 80, 83.

In November 1990, Abbott referred Olivieri to the State Insurance Fund, resulting in a physician's recommendation that she not be exposed to chemical vapors at work. (Docket No. 10, Exh. V, p. 19-20; Exh. VI, ¶ 5; (Exh. A)). The State Insurance Fund informed Olivieri's employer that she should be relocated to another work area where she would not be exposed to chemicals. (Docket No. 21, Exh. 10). After 1991, Olivieri was withdrawn from dealing directly with chemicals – notwithstanding the fact that her position normally required chemists to rotate through several tasks, some of which involved exposure to chemicals – and was asymptomatic until 1999. (Docket No. 17, Exh. 6, ¶¶ 8-10; Exh. 12). In 1999, Abbott referred Olivieri to Dr. Héctor Rosado Toledo[3] (Docket No. 10, Exh. V, p. 23), who concluded that Olivieri had a "severe reaction" to some of the chemicals in the laboratory, that she had been asymptomatic since 1991 because she had not thereafter been exposed to chemicals, and that she could perform her job adequately as long as she was not exposed to chemicals. (Docket No. 17, Exh. 12). In 1999, Olivieri's employer assigned her to work specifically at the T3 and Document Review areas, which did not involve exposure to chemicals. (Docket No. 17, Exh. 6, ¶¶ 12-13).

---

[3] Several Abbott communications in 1990 and 1999 attest to the employer's knowledge of Olivieri's condition. (See Docket No. 17, Exh. 13 (1999 internal memorandum stating that Olivieri cannot perform jobs exposed to chemicals and the company must develop safety procedural changes in order to eliminate her contact with fumes); Docket No. 21, Exh. 7 (1990 handwritten note by employer stating that employer is aware that Olivieri cannot be in contact with chemicals and that employer will put her to work in areas where she will not be exposed to chemicals)).

In May 2003, Olivieri informed her supervisor, Bernice Irizarry, that she had been subjected to religious harassment by co-workers. (Docket No. 17, Exh. 6, ¶ 16). Specifically, Olivieri alleged that "many times" co-workers mocked her religion by sarcastically saying to each other – within earshot of Olivieri – "Come on, we are going to pray," and that they would speak in tongues while putting a hand on a co-worker. (Docket No. 10, Exh. IV, pp. 15, 19-20). She also alleged that her co-workers sang a religious song in her presence, but changed the lyrics from "There is no God as big as you" to "There is no better Rum than Don Q," id. at p. 20, and that her co-workers damaged her religious music CDs by scratching them. (Docket No. 17, Exh. 6, ¶ 16; Docket No. 10, Exh. III, p. 44). Another incident consisted of a discussion between Olivieri and a co-worker, Lymaris, over whether Catholics prayed, after which Lymaris became upset. (Docket No. 10, Exh. IV, pp. 14-15). Olivieri stated she mentioned the religious persecution in prior evaluations and reported incidents to her supervisor, but that her supervisor would not undertake any remedial action as a result of her accusations. (Docket No. 10, Exh. IV, p. 17-18).

In response to these disclosures, Abbott undertook an investigation, during which the Human Resources Director interviewed several employees, including Olivieri and four of her co-workers. (Docket No. 10, Exh. II, ¶¶ 11-13).[4] The investigation concluded on July 3, 2003, and the Human Resources Director determined that while she could not confirm Oliveri had been harassed because of her religion, inappropriate discussions of religion and politics were taking place in the laboratory. Id. at ¶14; Docket No. 17-1, p. 1 (conceding ¶ 65 of Abbott's statement of uncontested material facts). As

---

[4] Abbott submitted a declaration by its Human Resources Director that itself attaches summaries of interviews with Abbott employees regarding Olivieri's complaint of religious harassment. (Docket No, 10, Exh. II). Both parties seek to bolster their arguments with statements purportedly made by Abbott employees as recorded in the interview summaries. The statements attributed to these employees in the interview summaries are inadmissible hearsay and will not be considered in deciding this motion.

**Nancy Olivieri, et al. v. Abbott Laboratories, et al.**                                    Page 6
**Civil No. 05-1244 (ADC/BJM)**
**Report and Recommendation**

a result, memoranda were sent to all laboratory employees requesting that they refrain from discussing controversial subjects such as religion and politics.  (Docket No. 10, Exh. II, ¶ 14; (Exh. L, M, O, P, Q, R, S)).  In addition, Abbott arranged several meetings between the laboratory supervisors and the employees to discuss how to improve the work environment, and brought in an outside speaker to give lectures on teamwork and workplace dynamics.  (Docket No. 10, Exh. II, ¶ 15; Exh. III, p. 47).

In August 2003, Olivieri discovered that someone had altered the samples she had been working on, ruining a day's work.  (Docket No. 10, Exh. IV, p. 16).  Olivieri talked to Lymaris about the incident and Lymaris understood Olivieri to be accusing Lumarie – another co-worker – of carrying out the sabotage.  Id.  Lumarie eventually found out about the alleged accusation and reported it to the Human Resources Department.  Id. at p. 16-19.  The Human Resources Department investigated (Docket No. 17, Exh. 2, p. 17), but found no improper accusation by Olivieri (Docket No. 17, Exh. 6, ¶ 19).  Nonetheless, Olivieri suffered depression and anxiety and was out of the office from August 20 until September 1, 2003.  (Docket No. 10, Exh. I, p. 120; Exh. II, ¶ 19).

On August 19, the head of the chemical laboratory issued a memorandum indicating the new rotation schedule, which included Olivieri in the rotation for all jobs, including those involving exposure to chemicals.  (Docket No. 21, Exh. 14).  Olivieri told her supervisor that she could not be exposed to chemicals, and he instructed her to remain at her position – which was called "weighing," and did not involve chemical exposure – until she talked to someone from the Human Resources.  (Docket No. 10, Exh. I, p. 126-27).  While working in the weighing position, she was exposed to ether from a co-worker's lab coat (Docket No. 17, Exh. 6, ¶ 24; Docket No. 21, Exh. 21), aggravating her medical condition.  (Docket No. 17, Exh. 6, ¶ 25).

Subsequently, Olivieri spoke with Miriam Bayron, the Human Resources Director, who instructed her to meet with a doctor to evaluate her medical condition and how to best accommodate her.  (Docket No. 10, Exh. I, p. 128-29; see also Docket No. 21, Exh. 15, 16).  On September 4, Dr. Andrés Fuentes, an occupational doctor for Abbott, informed: 1) that all evaluations of Olivieri from 1990 up until the present time coincided; 2) that she should be kept out of areas where she would be exposed to chemicals; and 3) that she should see a pneumologist.  (Docket No. 21, Exh. 17; Docket No. 10, Exh. I, p. 130).  Olivieri was then referred to a pneumologist, Dr. Chardón, who recommended that she not be exposed to chemicals or gasses.  (Docket No. 10, Exh. I, p. 130; Exh. V, p. 32; Docket No. 21, Exh. 19).  Dr. Benítez reviewed this evaluation and concurred, adding that further chemical exposure could lead to Olivieri developing occupational asthma.  (Docket No. 10, Exh. V, p. 33; Docket No. 21, Exh. 20).  Olivieri then was referred to Dr. Fuentes for further evaluation  (Docket No. 10, Exh. I, p. 147-48), but perceived some of Dr. Fuentes's questions to be "personal" in nature and would not concludedid not allow the doctor to finish the evaluation.  (Docket No. 10, Exh. II, ¶ 23).

In November, Dr. Chardón opined that Olivieri could work in the laboratory using a respirator (Docket No. 21, Exh. 23, 24; Docket No. 17, Exh. 25), but Olivieri refused because Dr. Rosado informed her in 1999 that this would not guarantee relief for her condition if exposed to chemicals (Docket No. 21, Exh. 26).  Dr. Chardon again was consulted on the viability of Olivieri working with a respirator.  (Docket No. 21, Exh. 27, 28).  On January 20, 2004, Abbott sent Olivieri a letter stating, "Pursuant to the evaluation performed by Dr Chardón, your condition does not allow you to perform the essential functions of your position. The doctor certifies that the condition you suffer does not allow you to work as Laboratory Technician III using a respirator." (Docket No. 17, Exh. 29).  The letter went on

to state that "[i]n order to seek an accommodation to this situation, a vacant position has been identified in the Engineering Department, which you could occupy if you are able to perform, with or without accommodation, the essential functions of the same," and invited Olivieri to meet with the Human Resources Director on January 23.  Id.  Olivieri did not show up for the meeting, later stating that she did not receive the letter on time.  (Docket No. 10, Exh. II, ¶ 26).  The two then agreed to meet on February 3, but Olivieri failed to show up for that meeting as well, later stating that she had been sick that day.  Id. at ¶ 28.  The two did  then agreed to meet on February 17, and the Human Resources Director discussed with Olivieri the possibility of her filling one of two open positions – Engineering Clerk and Quality Technician – which presumably did not involve direct contact with chemicals (Docket No. 10, Exh. II, ¶ 29; Docket No. 17, Exh. 6, ¶ 41), but Olivieri refused to consider those positions (Docket No. 10, Exh. II, ¶ 29; Docket No. 17, Exh. 31).  On March 9, the Human Resources Director sent Olivieri a letter stating that, since Olivieri cannot perform her job with the aid of a respirator and because Olivieri has not suggested any alternative accommodations, Abbott could no longer leave her position vacant.  (Docket No. 17, Exh. 31).  The letter also invited her to visit Abbott's Human Resources Department weekly to review available positions.  Id.  Olivieri visited the laboratory the following Tuesday, but never showed up thereafter.  (Docket No. 10, Exh. II, ¶¶ 32, 33).  On September 2, 2004, Abbott terminated Olivieri's employment.  Id. at ¶ 35; (Docket No. 17, Exh. 32).

## **DISCUSSION**

Abbott moves for summary judgment on each of plaintiffs' federal and state law claims. Each will be addressed in turn.

## I.        ADA Disability Discrimination

The ADA is a federal civil rights statute enacted "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities."  42 U.S.C. §12101(b)(1).    "In the employment context, the ADA prohibits a 'covered entity'...from 'discriminat[ing] against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment.'" Jacques v. Clean-Up Group, Inc., 96 F.3d 506, 510 (1st Cir. 1996), *quoting* Katz v. City Metal Co., Inc., 87 F.3d 26, 30 (1st Cir. 1996).

To establish a claim of disability discrimination under the ADA, a plaintiff must prove: "First, that he was disabled within the meaning of the Act. Second, that with or without reasonable accommodation he was able to perform the essential functions of his job. And third, that the employer discharged him," or otherwise discriminated against him in regard to compensation or other terms, conditions, and privileges of employment, "in whole or in part because of his disability." Katz, 87 F.3d at 30.

A plaintiff may also indirectly prove his or her case "by using the *prima facie* case and burden shifting methods" that originated in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  Katz, 87 F.3d at 30 n.2 (citations omitted); see also Dichner v. Liberty Travel, 141 F.3d 24, 29-30 (1st Cir. 1998).  This burden-shifting scheme applies in particular to claims of discriminatory discharge.  See Higgins v. New Balance Athletic Shoe, Inc., 194 F.3d 252, 264 (1st Cir. 1999).  Under this analysis, "a plaintiff must first prove by a preponderance of the evidence that he or she (i) has a disability within the

meaning of the Act; (ii) is qualified to perform the essential functions of the job, with or without

reasonable accommodations; (iii) was subject to an adverse employment action by a company subject

to the Act; (iv) was replaced by a non-disabled person or was treated less favorably than non-disabled

employees; and (v) suffered damages as a result." Jacques, 96 F.3d at 511.

Whether plaintiffs wish to pursue their claim directly or indirectly, they must prove by a

preponderance of the evidence that Olivieri was "disabled." Abbott argues that Olivieri was not disabled

under the ADA.  (Docket No. 10, Brief in Support of Motion for Summary Judgment ("Brief"), p. 6).

Specifically, Abbott avers that Olivieri's impairment did not substantially limit a major life activity.

Id. at pp. 7-9.

The ADA defines "disability" as: "(A) a physical or mental impairment that substantially limits

one or more of the major life activities of such individual; (B) a record of such an impairment; or (C)

being regarded as having such an impairment."  42 U.S.C. § 12102(2).  Following the statutory

language, the First Circuit requires that to demonstrate a disability under the ADA, a plaintiff must show

that she has an impairment which "substantially limits" a "major life activity."  See Lebrón-Torres v.

Whitehall Laboratories, 251 F.3d 236, 239 (1st Cir. 2001).

The Equal Employment Opportunity Commission ("EEOC") has promulgated regulations and

issued interpretive guidelines implementing the ADA,[5] which define "impairment" broadly to include

"[a]ny physiological disorder, or condition ... affecting [the] respiratory [system]."  29 C.F.R.

§1630.2(h); see also Quint, 172 F.3d at 9.  Olivieri's recurrent laryngotracheal bronchitis condition

clearly fits within this broad definition of "impairment," since it is a physiological disorder affecting the

---

[5] Courts in the First Circuit "accord deference to all reasonable ADA interpretations by the EEOC, the agency charged
with administering the ADA." Quint v. A.E. Staley Mfg. Co., 172 F.3d 1, 9 n.4 (1st Cir. 1999), citing Arnold v. UPS, 136 F.3d
854, 863-64 (1st Cir. 1998).

**Nancy Olivieri, et al. v. Abbott Laboratories, et al.**                                    Page 11
**Civil No. 05-1244 (ADC/BJM)**
**Report and Recommendation**

respiratory system. (Docket No. 10, Exh. I, p. 68). To prevail, however, plaintiffs must also prove that

Olivieri's impairment substantially limits a major life activity.

A "major life activity" is an activity of central importance to people's daily lives. Toyota Motor

Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 197 (2002). The term includes "functions such as caring for

oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working."

29 C.F.R. § 1630.2(i). With regard to working, the EEOC regulations provide that this activity is

substantially limited only where an individual is "significantly restricted in the ability to perform either

a class of jobs or a broad range of jobs in various classes as compared to the average person having

comparable training, skills and abilities." 29 C.F.R. § 1630.2(j)(3)(i). "The EEOC further identifies

several factors that courts should consider when determining whether an individual is substantially

limited in working, including 'the number and types of jobs utilizing similar training, knowledge, skills

or abilities, within [the] geographical area [reasonably accessible to the individual], from which the

individual is also disqualified.'" Santiago Clemente v. Executive Airlines, Inc., 213 F.3d 25, 32 (1st Cir.

2000), citing 29 C.F.R. § 1630.2(j)(3)(ii)(B). In addition, although "household chores" in general can

constitute a major life activity, Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184, 201-02 (2002),

specific household chores do not normally, by themselves, rise to that level. For example, sweeping and

gardening do not fit within the scope of the term. Id. at 202; cf. Marinelli v. City of Erie, Pa., 216 F.3d

354, 362-63 (3d Cir. 2000) (cleaning the floors was not a major life activity); Weber v. Strippit, Inc.,

186 F.3d 907, 914 (8th Cir. 1999) (shoveling snow, gardening, and mowing the lawn were not major

life activities).

The EEOC has defined "substantially limits" to mean:

(i) Unable to perform a major life activity that the average person in the general population can perform; or

(ii) Significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform the same major life activity.

29 C.F.R. § 1630.2(j)(1).  EEOC regulations also list the following considerations as relevant: "(i) The nature and severity of the impairment; (ii) The duration or expected duration of the impairment; and (iii) The permanent or long term impact, or expected permanent or long term impact of or resulting from the impairment."  29 C.F.R. § 1630.2(j)(2).

The Supreme Court has instructed that the phrase "substantially limits" suggests "considerable" or "specified to a large degree." Sutton v. United Air Lines, Inc., 527 U.S. 471, 491 (1999).  Even so, "while substantial limitations should be considerable, they also should not be equated with 'utter inabilities.'" Calero-Cerezo v. U.S. Dept. of Justice, 355 F.3d 6, 21 (1st Cir. 2004), *quoting* Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 307 (3d Cir. 1999). "When significant limitations result from an impairment, the disability definition is met even if the difficulties are not unsurmountable." Bragdon v. Abbott, 524 U.S. 624, 641 (1998).  "An impairment can substantially limit a major life activity, even though the plaintiff is still able to engage in the activity to some extent." Calero-Cerezo, 355 F.3d at 22; see also Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 22 (1st Cir. 2002).

Olivieri stated in her deposition that as a result of her impairment she cannot clean the bathroom or perform any other chores or activities where she is exposed to chemicals.  (Docket No. 10, Exh. I, p. 79-80).  Similarly, she testified that she was unable to perform any tasks at her job involving

**Nancy Olivieri, et al. v. Abbott Laboratories, et al.**                                                   Page 13
**Civil No. 05-1244 (ADC/BJM)**
**Report and Recommendation**

direct exposure to certain chemicals that were sometimes present in the laboratory, id. at p. 80, 83, a fact

which was confirmed by several doctors (see Docket No. 17, Exh. 12; Docket No. 21, Exh. 17, 19, 20).

Olivieri points to no other alleged major life activities interfered with by her impairment.  (See Docket

No. 17 (although plaintiffs dispute ¶ 13 of Abbott's Statement of Uncontested Material Facts – alleging

inability to clean bathroom as only alleged interference with a major life activity – they fail to point to

any additional major life activities of Olivieri with which her impairment interferes)).

Olivieri has failed to put forth enough evidence to raise an issue of material fact as to whether

her impairment interfered with a major life activity. First, cleaning the bathroom is a specific household

chore and Olivieri concedes that she is able to do most other household work.  And second, she has

failed to demonstrate that her impairment interferes with the major life activity of working because she

has not shown a broad range of jobs her impairment precludes her – in whole or in part – from

performing.

Importantly, the Supreme Court has pointed out that there is "some conceptual difficulty in

defining 'major life activities' to include work." Sutton v. United Air Lines, Inc., 527 U.S. 471, 492

(1999).  In fact, "[t]he EEOC has itself suggested that working be viewed as a residual life activity,

considered only as a last resort '[i]f an individual is not substantially limited with respect to any other

major life activity.'" Gelabert-Ladenheim v. American Airline, Inc., 252 F.3d 54, 58 (1st Cir. 2001),

*citing* 29 C.F.R. pt. 1630, App. § 1630.2(j); see also Lessard v. Osram Sylvania, Inc., 175 F.3d 193, 197

(1st Cir. 1999) ("'Working' itself is a somewhat elastic term...."). As a result, "[w]hen the major life

activity of working is at issue (as opposed to any other major life activity), the plaintiff 'assumes a more

fact-specific burden of proof.'" Lessard, 175 F.3d at 58, *citing* Quint v. A.E. Staley Mfg. Co., 172 F.3d

1, 11 (1st Cir. 1999).  "The issue of whether the plaintiff's impairment substantially limits the major life

activity of working involves a multi-level analysis, starting with the skills of the plaintiff herself and

moving to the nature of the jobs she was prevented from performing as well as those she was not."

Lessard, 175 F.3d at 59.  This individualized inquiry focuses first on the characteristics of the plaintiff

– such as "education level, training, job skills, expertise, and knowledge" – and then focuses on the

relevant job market, including which jobs are closed to plaintiff and which are still open within the

reasonably accessible geographic area.  Id.

          Several cases have involved claims by plaintiffs impaired in a manner similar to Olivieri and

are therefore instructive here.  In Maulding v. Sullivan, 961 F.2d 694 (8th Cir. 1992), the plaintiff was

a chemist who worked in a laboratory.  Id. at 695.  She developed a sensitivity to "noxious fumes", and

her doctor stated that further exposure would be "detrimental to her health based on adverse asthmatic

reactions."  Id. at 696.  There, "[t]he district court held that even if the plaintiff were a handicapped

person under the statute, she could not show that her sensitivity to chemicals substantially limits her

major life activities," and granted summary judgment for the defendant.  Id. at 698.  The court of appeals

affirmed, holding that "[w]e find no error in [the court's] conclusion that her ailment would prevent her

only from doing lab work, and that such a limitation does not substantially limit her employment as a

whole."  Id. at 698, *citing* Forrisi v. Bowen, 794 F.2d 931, 934 (4th Cir. 1986) ("an employer does not

necessarily regard an employee as handicapped simply by finding the employee to be incapable of

satisfying the singular demands of a particular job"), *and* Jasany v. U.S. Postal Serv., 755 F.2d 1244,

1248-49 (6th Cir. 1985) (major life activity not substantially limited when impairment interferes with

performance of one particular job).  Likewise, in Patrick v. Southern Co. Serv., 910 F.Supp. 566

(N.D.Ala. 1996), the plaintiff suffered "Multiple Chemical Sensitivities" from exposure in the workplace. Id. at 570. The court there granted summary judgment for the defendant, holding that "there is no substantial evidence that plaintiff has an impairment which disqualifies her 'from a class of jobs or a broad range of jobs in various classes.'" Id. The court further stated in support of its holding that "'[a]n impairment that disqualifies a person from only a narrow range of jobs is not considered a substantially limiting one.'" Id. at 571, *quoting* Heilweil v. Mount Sainai Hosp., 32 F.3d 718, 723 (2d Cir. 1994).

Yet another analogous case is Huffman v. Ace Electric Co., Inc., 1994 WL 583113 (D.Kan. 1994). There, the plaintiff argued that "she has a permanent hypersensitivity to unknown industrial contaminants which limits her capacity to work in certain environments; that she is precluded from performing not merely this one job, but all jobs in similar environments; and that ... this hypersensitivity has substantially limited her life activity of working." Id. at *4. The court granted summary judgment on plaintiff's ADA claim, holding that "[o]ther than the one position from which she was terminated, plaintiff has not identified a single job which she is incapable of performing on account of her hypersensitivity to unknown agents." Id. at *5. Finally, in Minnix v. City of Chillicothe, 2000 WL 191828 (6th Cir. 2000), the Sixth Circuit affirmed the district court's granting of summary judgment on the plaintiff's ADA claim, which was based on plaintiff's occupational-induced recurrent bronchitis. There, the court stated that although the plaintiff "testified that he is able to work, but that he cannot work in a job that would expose him to diesel fumes," "[t]his neither amounts to an inability to work nor a significant restriction as to the condition, manner, or duration under which [the plaintiff] can work." Id. at *2. The court went on to hold that the plaintiff's major life activity of working was not

substantially impaired, and mentioned as material the fact that during plaintiff's absence from work, the

employer "offered him a position as a refuse truck driver, the only position available at the time that did

not involve diesel fume exposure," but that the plaintiff "declined the offer." Id. at *1.

Here, although Olivieri was unable to perform jobs involving certain chemicals, she did not

submit any evidence with regard to exactly which jobs these are. She does, however, indicate that there

were other positions within the laboratory that did not involve chemical exposure. (Docket No. 17, Exh.

6, ¶ 7; Exh. 14, p. 2). In fact, Abbott discussed the possibility of Olivieri filling either of two open

positions – Engineering Clerk and Quality Technician – which presumably did not involve contact with

chemicals (Docket No. 10, Exh. II, ¶ 29; Docket No. 17, Exh. 6, ¶ 41), but Olivieri refused to consider

those positions (Docket No. 10, Exh. II, ¶ 29; Docket No. 17, Exh. 31). Additionally, Olivieri failed to

submit evidence with regard to the number and types of jobs utilizing similar training, knowledge, skills

or abilities, within Puerto Rico, from which she is either qualified or disqualified. See Santiago

Clemente, 213 F.3d at 32; 29 C.F.R. §1630.2(j)(3)(ii)(B). Moreover, plaintiffs have failed to show how

this case is distinguishable from the several other cases where summary judgment was granted on

similar facts. See Maulding, 961 F.2d at 695, 698; Patrick, 910 F.Supp. at 570-71; Huffman, 1994 WL

583113, at *4-*5; Minnix, 2000 WL 191828, at *1-*2.

Furthermore, "[i]t has been recognized that an employer's offer to reassign an individual may

be a factor indicating that the individual did not have a substantial limitation on the major life activity

of working for purposes of the ADA." John F. Wagner, *What Constitutes Substantial Limitation on*

*Major Life Activity of Working for Purposes of Americans with Disabilities Act*, 141 A.L.R. Fed. 603,

at § 7 (1997); see also Williams v. City of Charlotte, 899 F.Supp. 1484 (W.D.N.C. 1995) (disorder

experienced as a consequence of assignment to night-shift duty did not substantially limit major life

activity of working, in part because the plaintiff had been offered other positions but rejected them).

Thus, the fact that Abbott offered Olivieri an alternative position in the Engineering Department tips

the scale even more heavily in Abbott's favor for the purposes of this motion. (See Docket No. 17, Exh.

29 (letter to Olivieri stating that "[i]n order to seek an accommodation to this situation, a vacant position

has been identified in the Engineering Department, which you could occupy if you are able to perform,

with or without accommodation, the essential functions of the same")). Accordingly, plaintiffs have

failed to raise a genuine issue of material fact as to whether Olivieri was disabled.

Plaintiffs alternatively aver that Olivieri was regarded by Abbott as being disabled. (Docket

No. 17, p. 2, 10). There are two ways an individual may be found to be regarded as disabled under the

statute: "(1) a covered entity mistakenly believes that a person has a physical impairment that

substantially limits one or more major life activities, or (2) a covered entity mistakenly believes that an

actual, nonlimiting impairment substantially limits one or more major life activities." Sutton, 527 U.S.

at 471, 489. But a plaintiff claiming to be regarded as disabled "cannot merely show that his employer

perceived him as *somehow* disabled; rather, he must prove that the employer regarded him as disabled

*within the meaning of the ADA*." Bailey v. Georgia-Pacific Corp., 306 F.3d 1162, 1169 (1st Cir. 2002)

(italics in original). As such, in order for Olivieri to show that Abbott perceived her to be substantially

limited in the major life activity of working, she "must show that [s]he was perceived as being unable

to work in either a class of jobs or a broad range of jobs in various classes as compared with the average

person having comparable training, skills, and abilities." Id. at 1169-70; see also Whitlock v. Mac-Gray,

Inc., 345 F.3d 44, 46 (1st Cir. 2003) (to support a claim for being regarded as disabled, a plaintiff "must

**Nancy Olivieri, et al. v. Abbott Laboratories, et al.**                    Page 18
**Civil No. 05-1244 (ADC/BJM)**
**Report and Recommendation**

come forward with evidence that the employer perceived him as 'precluded from more than a particular

job'"), *citing* Murphy v. UPS, 527 U.S. 516, 523-25 (1999); Sheehan v. City of Gloucester, 321 F.3d

21, 26 (1st Cir. 2003) ("In order for us to find [plaintiff] disabled under the 'regarded as' prong of the

ADA, [plaintiff] would have to show that the City regarded his hypertension as rendering him unable

to perform a broad range of jobs."), *citing* 29 C.F.R. § 1630.2(j)(3)(i).

      The evidence on the record strongly supports the notion that Abbott viewed Olivieri as

disabled.  (See Docket No. 17, Exh. 6 ("I was recognized by my employer as having a disability since

1991"); Exh. 29 ("Pursuant to the evaluation performed by Dr. Chardón, your condition does not allow

you to perform the essential functions of your position. The doctor certifies that the condition you suffer

does not allow you to work as a Laboratory Technician III using a respirator.")).  That is not to say,

however, that Abbott viewed Olivieri as disabled under the ADA – i.e., unable to work in either a class

of jobs or a broad range of jobs in various classes as opposed to a "narrow range of jobs."  Though the

record contains numerous references to Abbott's awareness of Olivieri's medical condition (see Docket

No. 17, Exh. 12 (note from Dr. Héctor Rosado Toledo stating that Olivieri should be assigned to jobs

where she is not exposed to chemicals); Exh. 13 (internal memorandum stating that Olivieri cannot be

exposed to chemicals); Exh. 29; Docket No. 21, Exh. 7 (note to Olivieri from employer stating that they

are aware of her medical condition and will consequently place her in a position where she will not be

exposed to chemicals)), and shows that Abbott offered Olivieri accommodation on account of her

condition (see Docket No. 17, Exh. 6, ¶¶ 13-14; Exh. 29), there is no evidence on record of the specific

jobs which Abbott considered Olivieri unable to perform, except for that of Laboratory Technician III

(Docket No. 17, Exh. 29).  See Keith v. Ashland, Inc., 205 F.3d 1340, 2000 WL 178389, *4 (6th Cir.

2000) ("To hold that an employer perceives a troubled employee as disabled under the ADA by making an offer to accommodate such an employee 'would unnecessarily inhibit employers from any inquiry regarding the status of behavior on the part of an employee that an employer may perceive as inappropriate for the employment environment.'"), *quoting* <u>Kvintus v. R.L. Polk & Co.</u>, 3 F.Supp.2d 788, 796 (E.D.Mich. 1998); <u>Summers v. Middleton & Reutlinger, P.S.C.</u>, 214 F.Supp.2d 751, 756 (W.D.Ky. 2002) ("Plaintiff also argues she was regarded as disabled because defendant made efforts to accommodate her by offering an alternative position. Again, however, the mere fact that defendant was aware that working for [employer] Higgins caused plaintiff stress and attempted to relieve that stress does not necessarily mean defendant regarded her as having a substantially limiting impairment."). To the contrary, the record reflects that Abbott regarded her as being able to perform other jobs at its facility. (<u>See</u> Docket No. 10, Exh. II, ¶ 29; Docket No. 17, Exh. 6, ¶ 41; Exh. 29). In short, being regarded as unable to perform a single job – or even a narrow range of jobs – falls short of being regarded as disabled under the ADA.

Olivieri has put forth no evidence on which a trier of fact reasonably could find that Abbott viewed her as unable to perform a class of jobs or a broad range of jobs in various classes. Thus, no reasonable jury could find that Abbott viewed Olivieri as disabled under the ADA. <u>See</u> 42 U.S.C. §12102(2). Because plaintiffs have failed to put forth sufficient evidence that Olivieri was "disabled" under the ADA, I need not address the remaining related issues. I therefore recommend that Abbott's motion for summary judgment on the ADA claim be **granted**.

## II.    The Title VII Claims

Plaintiffs' Title VII cause of action can be separated into two claims: one for hostile work environment and one for retaliation.  (See Docket No. 1, ¶¶ 47-48 (claiming that Olivieri was harassed at work on account of her religion and that her reporting of these incidents was "eventually turned against her"); Docket No. 17-2, p. 15-16 ("As a result of Plaintiffs' complaint of hostile work environment and the comments she made regarding the sabotage of her work, Defendants proceeded to eliminate her reasonable accommodation which she held since 1999")).  Abbott moves for summary judgment on both claims.  (Docket No. 10, Brief, p. 19-26).

### A.    Hostile Work Environment

"To make out a viable [Title VII] workplace harassment claim based on religion, the plaintiff must establish that: (1) she is a member of a protected class; (2) she was subject to uninvited harassment; (3) the offending conduct was *because of her religion*; (4) the harassment was severe and pervasive; (5) the offending conduct was both objectively and subjectively offensive and (where employer liability is sought); (6) there was a basis for such liability."  Rosario Rivera v. P.R. Aqueduct and Sewers Auth., 331 F.3d 183, 189 (1st Cir. 2003) (italics in original).  For the purposes of summary judgment, Abbott attacks only the third and fourth prongs of this test.

### 1.    Evidence that Harassment was Because of Religion

Abbott first argues a lack of evidence that any harassment was motivated by religion.  Indeed, plaintiffs "must show that alleged discriminatory conduct was not 'merely tinged' with remarks abhorrent to [Olivieri's] religion but actually was, in either character or substance, discrimination

*because of religion*."   Rosario Rivera, 331 F.3d at 189-90 (italics in original), *citing* Oncale v.

Sundowner Offshore Servs., 523 U.S. 75, 81 (1998).

In Rosario Rivera, the plaintiff brought a Title VII hostile work environment claim based on

her adherence to "charismatic Catholicism."  Id. at 185.  There, the plaintiff claimed that: 1) "her co-

workers were critical of her faith and spirituality"; 2) she was given the nickname "Mother Theresa" as

a result of her disapproval of her co-workers' vulgarity; 3) a co-worker sang her "a bawdy Christmas

carol mentioning her name"; and 4) she was given a birthday card depicting "a pig wearing a rosary next

to [plaintiff's] birth date."  Id. at 190-91.  After analyzing the facts, the First Circuit affirmed the district

court's granting of summary judgment on the plaintiff's hostile work environment claim, emphasizing

that "there is a conceptual gap between an environment that is offensive to a person of strong religious

sensibilities and an environment that is offensive because of hostility to the religion guiding those

sensibilities."  Id.

Importantly, the court in Rosario Rivera analyzed each of the religiously "tinged" incidents

against a factual record that "show[ed] the budget office at PRASA was an unprofessional environment.

The workers frequently swore, engaged in horseplay, and were derelict in their work duties."  Id.

Accordingly, the factual record was clear that the  "Mother Theresa" moniker and the bawdy Christmas

carol, while offensive to plaintiff's religious beliefs, were not the result of religious animus but were

responses to the plaintiff's constant complaints about the vulgarity of the office and were "characteristic

of the office's vulgar and unprofessional environment - an environment to which all were subjected."

Id. at 190.  Moreover, the court  noted that plaintiff "was not averse to proselytizing and opining that her

way was the right way. She would often chide her co-workers for their obscene language and poor work

habits... Unsurprisingly, this course of conduct provoked them and they responded in ways apparently

meant to offend her. Such antics, while deplorable, do not amount to a violation of Title VII." Id. at 191,

*citing* Wilson v. U.S. West Communications, 58 F.3d 1337, 1342 (8th Cir. 1995) (noting that "Title VII

does not require an employer to allow an employee to impose his religious views on others"). In the end,

"a constellation of factors led to the friction between Rosario and her co-workers, but no reasonable fact

finder could conclude on the basis of the incidents we have described or the general atmosphere in the

office that one of these factors was an antipathy towards Rosario's underlying religious convictions."

Id.

              In this case, the religiously-charged incidents Olivieri complains of include her co-workers

making sarcastic religious statements (such as "Come on, we are going to pray"), speaking (mockingly)

in tongues,  singing a  song from plaintiff's religion with the altered lyrics of "There is no better Rum

than Don Q," and destroying her religious CDs.  These incidents bear many similarities to the incidents

at issue in Rosario Rivera. Nevertheless, the factual record in that case differed from the present case

in one critical regard.  In Rosario Rivera, the factual record was replete with incidents of vulgarity and

unprofessional behavior that all workers, regardless of their religion, were subjected to.  Because

(secular) vulgarity, profanity, hostility and unprofessionalism were the norm, the First Circuit found that

a reasonable jury could not conclude that the incidents suffered by plaintiff were motivated by hostility

to her religion.  In the present case, the factual record does not include admissible evidence that all

workers at Abbott were subjected generally  to an uncivil working environment that had nothing to do

with religion.  Rather, Abbott's investigation of Olivieri's complaint concluded that the tensions in the

office were due to inappropriate discussions of religion and politics.[6]  Against this background, and

viewing the evidence in the light most favorable to plaintiffs, I find that a reasonable jury could - but

certainly would not have to - conclude that Olivieri's co-workers were motivated by religious hostility

when they mockingly prayed, sang, and spoke in tongues in her presence, and when they vandalized her

religious music CDs.

### 2.        Whether the Harassment was Severe and Pervasive.

Abbott also argues that the conduct alleged by Olivieri does not rise to the level of severe and

pervasive under Title VII.  (Docket No. 10, Brief, p. 2).  The "severe or pervasive" inquiry is highly fact-

specific.  See Marrero v. Goya of P.R., Inc., 304 F.3d 7, 19 (1st Cir. 2002); Figueroa Garcia v. Lilly del

Caribe, Inc., 490 F.Supp.2d 193, 204 (D.P.R. 2007).  To succeed on the hostile work environment claim,

plaintiffs must demonstrate that Olivieri's co-workers' conduct was "so severe or pervasive that it altered

the terms or conditions of her employment."  Pomales v. Celulares Telefónica, Inc., 447 F.3d 79, 83 (1st

Cir. 2006).  The misconduct shown must be severe or pervasive enough to create an objectively hostile

or abusive work environment, and the victim must also subjectively perceive that environment to be

abusive.  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).  The court's examination of the

evidence on this issue must take into account the totality of the circumstances; there is no mathematically

precise test to determine whether a plaintiff has demonstrated sufficiently severe or pervasive

harassment.  See Pomales, 447 F.3d at 83.  Factors the court should consider include: "the frequency of

the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere

---

[6]  One incident in the record supports the finding of religious tension in the office, namely the altercation between Lymaris and Olivieri regarding whether or not Catholics pray (see Docket No. 10, Exh. IV, p. 14-15). While "neither the Constitution nor Title VII prohibits honest disagreement about religion in the workplace," Rosario Rivera, 331 F.3d at 191 n. 4, this incident lends support to a finding that the incidents Olivieri complains of may have been motivated by religious animus.

offensive utterance; and whether it unreasonably interferes with an employee's work performance."
<u>Harris</u>, 510 U.S. at 23; <u>see also</u> <u>Johnson v. Spencer Press of Me., Inc.</u>, 364 F.3d 368, 377 (1st Cir. 2004).
"'Subject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide
whether the harassment was of a kind or to a degree that a reasonable person would have felt that it
affected the conditions of her employment." <u>Marrero</u>, 304 F.3d at 19, *quoting* <u>Gorski v. N.H. Dep't of
Corr.</u>, 290 F.3d 466, 474 (1st Cir. 2002).

Moreover, instances of harassment involving religion must not be separated from those that
do not necessarily involve the same. To discount the harassment incidents that do not necessarily
involve religion would "def[y] the [Supreme Court's] directive to consider the totality of circumstances
in each case and 'rob[s] the incidents of their cumulative effect.'" <u>O'Rourke v. City of Providence</u>, 235
F.3d 713, 730 (1st Cir. 2001), *citing* <u>Williams v. General Motors Corp.</u>, 187 F.3d 553, 561 (6th Cir.
1999). "[S]uch an approach not only ignores the reality that incidents of [non-religions] conduct–*such
as work sabotage*, exclusion, denial of support, *and humiliation*–can in context contribute to a hostile
work environment, it also nullifies the harassing nature of the conduct." <u>O'Rourke</u>, 235 F.2d at 730
(emphasis added). Nevertheless, Title VII is not a "general civility code." <u>See</u> <u>O'Rourke v. City of
Providence</u>, 235 F.3d 713, 729 (1st Cir. 2001); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 788
(1998); <u>Oncale v. Sundowner Offshore Servs., Inc.</u>, 523 U.S. 75, 81 (1998). "[S]imple teasing,' offhand
comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes
in the 'terms and conditions of employment." <u>Faragher</u>, 524 U.S. at 788 (internal citation omitted).

Here, the record contains evidence that Olivieri subjectively felt harassed by her co-workers
and in fact complained of harassment to her supervisor on at least one occasion. (<u>See</u> Docket No. 10,

Exh. IV, p. 17-18; Docket No. 17, Exh. 6, ¶ 16).  A much closer question, however, is whether Olivieri

has demonstrated sufficient severity and pervasiveness utilizing the four factors outlined in <u>Harris</u>.

      With respect to frequency of the conduct, Olivieri testified in deposition that two of her co-

workers made mocking comments, spoke in tongues and sang a religious song with altered words

"[m]any times." (Docket No. 10, Exh. IV, p. 20).   However, the record does not speak to when these

incidents happened or whether they occurred on a daily basis. <u>See</u> <u>Johnson</u>, 364 F.3d at 374, 377 ("[t]he

[religious] harassment occurred throughout [plaintiff's] work day, including when he was attempting

to perform his custodial duties," and the incidents occurred "on a daily basis").  Moreover, the majority

of the incidents alleged by Olivieri are not particularly severe, and the mocking prayers, speaking in

tongues and religious song, though offensive and in bad taste, seem little more than teasing and sarcasm;

standing alone, I doubt these incidents would rise to the level of significantly altering plaintiff's

conditions of employment.  <u>See</u> <u>Faragher</u>, 524 U.S. at 788. Moreover, Olivieri stated that she was not

even upset by the disagreement between her and Lymaris.  (Docket No. 10, Exh. IV, p. 15).

      Nevertheless, two of the incidents - the damage done to her religious CDs and the sabotage

of her work samples - posed a more significant threat to her working environment.  Though neither

incident constituted a physical threat to her person, they did involve harm to her personal property in the

workplace and to her working product.  These incidents carry greater weight in determining whether the

harassment significantly altered her working conditions.

      In the end, plaintiffs' allegations, taken together, create a close call as to whether a reasonable

jury could find that they amount to "extreme" conduct that alters the terms and conditions of Olivieri's

employment. <u>See</u> <u>Faragher</u>, 524 U.S. at 788. On the one hand, many of plaintiffs' allegations, taken by

themselves, amount to nothing more than insults and inappropriate sarcasm or humor.  But  other

instances – such as the destruction of Olivieri's religious CDs and the destruction of her samples – are

more serious in nature.  Since questions of whether harassment is actionable under Title VII is "best left

to the jury" except in cases which are clearly at one end of the spectrum or the other, <u>Figueroa García</u>,

490 F.Supp.2d at 204-05, I find that summary judgment is not appropriate in this case.  Reading the facts

in the light most favorable to the plaintiffs, a reasonable jury could find - but by no means would be

compelled to find - that the harassment was severe and pervasive under Title VII.  I therefore recommend

that Abbott's motion for summary judgment on the Title VII hostile work environment claim be **denied**.

### B.        Retaliation

In order to make out a prima facie case of retaliation, plaintiffs must show that: "(1) [Olivieri]

engaged in protected conduct under Title VII; (2) she suffered an adverse employment action; and (3)

the adverse action was causally connected to the protected activity." <u>Marrero v. Goya of P.R., Inc.</u>, 304

F.3d 7, 22 (1st Cir. 2002), *citing* <u>Hernández-Torres v. Intercontinental Trading, Inc.</u>, 158 F.3d 43, 47 (1st

Cir. 1998).  With regard to the first prong, "[p]rotected conduct includes not only the filing of

administrative complaints, but also complaining to one's supervisors."  <u>Valentin-Almeyda v.</u>

<u>Municipality of Aguadilla</u>, 447 F.3d 85, 94 (1st Cir. 2006), *citing* <u>Benoit v. Technical Mfg. Corp.</u>, 331

F.3d 166, 175 (1st Cir. 2003) (internal citation omitted).  Here, the evidence on record shows several

instances where Olivieri engaged in protected activity, including informing her supervisor in May 2003

that she was being subjected to a hostile work environment based on her religion (Docket No. 17, Exh.

6, ¶ 16); telling her supervisor on other occasions about the harassment she was receiving (Docket No.

10, Exh. IV, p. 15, 21); including allegations of religious persecution in evaluations, <u>id.</u> at p. 22; and

filing a complaint with the EEOC on November 17, 2003 (Docket No. 17, Exh. 6, ¶ 38).

Turning to the second prong, "[a]dverse employment actions include 'demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations, and toleration of harassment by other employees.'" Marrero, 304 F.3d at 23, *quoting* White v. N.H. Dept. of Corrections, 221 F.3d 254, 262 (1st Cir. 2000). "Congress recognized that job discrimination can take many forms, and does not always manifest itself in easily documentable sanctions such as salary cuts or demotions. Accordingly, Congress 'cast the prohibitions of Title VII broadly' to encompass changes in working conditions that are somewhat more subtle, but equally adverse." Marrero, 304 F.3d at 23-24, *citing* Rodriguez v. Bd. of Educ., 620 F.2d 362, 364 (2d Cir. 1980). Moreover, "[w]hether an employment action is 'adverse' ... is gauged by an objective standard." Marrero, 304 F.3d at 23, *citing* Blackie v. Maine, 75 F.3d 716, 725 (1st Cir. 1996). Here, there is sufficient evidence that Oliveri suffered adverse employment actions insofar as she once again was required to work with chemicals, she was asked to consider other positions, and she eventually was terminated.

The more difficult question, however, is whether these adverse employment actions were causally connected to the protected conduct. One instance of protected conduct was Olivieri's informing her supervisor of the harassment. Although she stated in her deposition that she "always" told her supervisor of the harassment, she mentions only two specific dates: one in May 2003 and one in August 2003. (Docket No. 17, Exh. 6, ¶¶ 16, 18). Plaintiffs allege that these disclosures – along with the discussion regarding Olivieri's sabotaged work – led to the elimination of Olivieri's accommodation. (Docket No. 17-2, p. 15-16). However, after Olivieri informed her supervisor in May 2003 of the religious harassment, the Human Resources Department launched a comprehensive investigation of her

claims involving interviews with numerous co-workers and with Olivieri herself (Docket No. 10, Exh.

II, ¶¶ 11-14; see also Exh. I-T).  In addition, the Human Resources Department "arranged several

meetings with the employees to discuss the work environment and how to improve the same ... [and]

even brought an external resource to help with this interest and to encourage the employees' team work."

(Docket No. 10, Exh. II, ¶ 15).  By spending significant time and resources on investigating Olivieri's

claim, Abbott's reaction to her complaint was not one of religious discrimination (or toleration of

religious harassment), but rather one of an employer responding with concern over allegations by one

of its employees.  Such remedial actions weigh heavily against a finding of retaliation by Abbott.  See

Carmona-Rivera v. Puerto Rico, 464 F.3d 14, 20 (1st Cir. 2006) (finding no retaliation in part because

"[t]he fact remains that the [defendant] school took steps to meet [plaintiff's accommodation] requests

and did not stonewall her").  The fact that protected conduct took place at some point before an adverse

action was performed is insufficient, by itself, to allow a jury to find for the plaintiffs.  See Kosereis v.

Rhode Island, 331 F.3d 207, 217 (1st Cir. 2003) (finding no causal connection in retaliation claim and

noting that it is insufficient to state that claimant engaged in a protected activity and then was

disciplined); Randlett v. Shalala, 118 F.3d 857, 862 (1st Cir. 1997) ("[T]he adverse action must have

been for the *purpose* of retaliating. And to defeat summary judgment, a plaintiff must point to *some*

evidence of retaliation by a pertinent decisionmaker.").  Moreover, plaintiffs fail to explain how this May

2003 complaint led to the elimination of Olivieri's accommodation *three months later* on August 19.

        Plaintiffs also fail to demonstrate a causal connection between the August 2003 disclosure by

Olivieri to her supervisor and the loss of the accommodation.  After Olivieri complained that her samples

had been altered, her supervisor told her to investigate what happened (Docket No. 17, Exh. 6, ¶ 18),

again a reaction inconsistent with retaliatory animus.  In fact, it was Olivieri's alleged accusation of one

of her co-workers – which another co-worker reported to the Human Resources Department – which led

to the investigation that ultimately upset Olivieri and which she blames as one of the contributing factors

leading to the elimination of her accommodation.  (See Docket No. 17-2, p. 15-16 (alleging "comments

she made regarding the sabotage of her work" led to adverse employment action)).  But this specific

incident is separate and distinct from her exercise of a protected activity, which was her reporting of the

sabotage to her supervisor.  Accordingly, the evidence on record cannot support a finding of a causal

connection between Olivieri's August 2003 complaint to her supervisor and an adverse employment

action.

        The final protected activity was the November 17, 2003 filing of a complaint with the EEOC

(Docket No. 17, Exh. 6, ¶ 38), which was followed by the termination of Olivieri's employment nine-

and-a-half months later on September 4, 2004 (Docket No. 10, Exh. II, Exh. Y).  Not only does the

length of time between the two occurrences weigh against a finding of retaliation, see Benoit, 331 F.3d

at 175 ("insufficient evidence for a jury to find" causal relationship between protected activity and

adverse employment action that happened one year apart); Dressler v. Daniel, 315 F.3d 75, 80 (1st Cir.

2003) ("[T]he inference of a causal connection becomes more tenuous with time."); Mesnick v. General

Elec. Co., 950 F.2d 816, 828 (1st Cir. 1991) (a nine-month period between the protected conduct and

adverse action suggested the absence of any causal connection), but the record is replete with evidence

of Abbott's efforts to accommodate Olivieri during the  period of time between her complaint and

termination.  On November 20, 2003, Miriam Bayron, the Human Resources Director, spoke with

Olivieri regarding her medical condition and stated that Abbott was trying to provide alternatives that

would allow her to return to work.  (Docket No. 10, Exh. II, ¶ 24).  Ms. Bayron sent Olivieri a letter on

January 20, 2004, inviting her to meet and explore alternative accommodations, but Olivieri did not

show up for the meeting, claiming later that she had not received the letter on time.  Id. at ¶¶ 25-26; Exh.

U.  The two then agreed to meet on February 3, but Olivieri did not show up for that meeting either,

claiming later that she had been sick.  Id. at ¶¶ 26-27.  The two finally met on February 17 to discuss

available positions that would not involve exposure to chemicals, but Olivieri rejected both positions

without looking at the job descriptions, stating that she would not consider a position at a lower level.

Id. at ¶ 29.  That same day, Ms. Bayron sent a letter to Olivieri confirming the meeting and stating that

Abbott would inform her of any position that becomes available.  Id. at ¶ 30; Exh. W.  On March 9, Ms.

Bayron sent another letter to Olivieri suggesting that she visit Abbott's Human Resources Department

every week to review available positions.  Id. at ¶ 31; Exh. X.  Olivieri visited the department on March

16, but never returned thereafter.  Id. at ¶¶ 32-33.  It wasn't until September 2, 2004 – more than a year

after Olivieri's last day of work and more than five months after she last visited the Human Resources

Department – that Olivieri's employment was terminated.  Id. at ¶ 35; Exh. Y.  Under these facts, no

reasonable jury could find the required causal connection between Olivieri's filing of a complaint with

the EEOC and the termination of her employment.  I therefore recommend that defendants' motion for

summary judgment as to the Title VII retaliation claim be **granted**.

### III.     Puerto Rico Law Claims

#### A.     Law No. 44

Abbott moves for summary judgment on the claim under Puerto Rico's Law 44, claiming that

since plaintiffs have failed to establish a cause of action under the ADA, they are likewise unable to

establish a cause of action under Law 44.  (Docket No. 10, Brief, pp. 26-27).  Plaintiffs concede that their

Law 44 claim must share the same fate as their ADA claim.  (Docket No. 17, Brief, pp. 20-21).

        Law 44 originally was enacted "to prohibit discrimination against individuals with physical

or mental disabilities in public institutions or private entities which received funds from the

Commonwealth of Puerto Rico."  Aramark v. Aramark Corp., 239 F.Supp.2d 153, 168 (D.P.R. 2003),

*citing* Statement of Motives of Law No. 44 of July 22, 1985.  Following the passage of the ADA, Puerto

Rico's Legislature approved Law No. 105 of December 20, 1991, with the express purpose of

broadening Law 44's protection to persons employed by private institutions in Puerto Rico and to

conform Law 44 to the ADA.  Aramark, 239 F.Supp.2d at 168-69, *citing* Statement of Motives of Law

No. 105 of December 20, 1991.  In order to make Law 44 comport with the ADA, Law 105 "amended

the definition of 'individual with physical disability' to include all persons that have a disability that

substantially limits one or more of the major life activities; that the person have a history of such a

condition; or that the person be regarded as having such a disability."  Aramark, 239 F.Supp.2d at 169;

see also 1 L.P.R.A. § 501(d).  "Plainly, the definition of disability in Law 44 mirrors the ADA's

definition of disability. Since it was the Legislature's express intent to harmonize the local statute with

the ADA, it follows that ADA precedent regarding the definition of disability must be read into cases

arising from the local statute."  Aramark, 239 F.Supp.2d at 169, *citing* UPR v. Asoc. Profesores

Universitarios, 136 D.P.R. 335 (1994); Bruno López v. Motorplan, 134 D.P.R. 111 (1993); Pérez

Maldonado v. J.R.T., 132 D.P.R. 972 (1993).

        Here, summary judgment should be granted on plaintiffs' ADA claim because they have failed

to raise a genuine issue of material fact as to whether Olivieri was disabled or regarded as disabled by

her employer under the ADA.  It follows that plaintiffs have failed to raise a genuine issue of material

fact as to Olivieri's disability under Law 44.  Aramark. at 169; see also Gonzalez v. El Dia, Inc., 304

F.3d 63, 74 n.8 (1st Cir. 2002) (affirming dismissal of conterminous claim under Law 44 upon dismissal

of ADA claim); Acevedo López v. Police Dep't of P.R., 247 F.3d 26, 29 (1st Cir. 2001) ("the

Commonwealth prohibits employment discrimination on the basis of disability in a similar fashion as

the ADA"). I therefore recommend that Abbott's motion for summary judgment on the Law 44 claim

be **granted**.

### B.        Law No. 100

Abbott moves for summary judgment on plaintiffs' claim under Law 100, averring that

plaintiffs cannot establish the prima facie case because Abbott had just cause for terminating Olivieri's

employment.  (Docket No. 10, Brief, pp. 27-29).  Plaintiffs argue that the "pattern of discriminatory

behavior" in the record preceding the termination of Olivieri's employment is sufficient to establish the

prima facie case, and cite to a series of exhibits, the contents of which are largely inadmissible hearsay.

(Docket No. 17, Brief, pp. 21-22).

Puerto Rico's Law 100 provides civil liability for, *inter alia*, religious discrimination in

employment.[7]  29 L.P.R.A. § 146.  This statute differs from Title VII, however, by establishing a

rebuttable presumption of discrimination unless the employer can demonstrate that the action in dispute

was justified.  Alvarez-Fonseca v. Pepsi Cola of P.R. Bottling Co., 152 F.3d 17, 27 (1st Cir. 1998).

Under this law, in order to rebut the presumption, the employer has the burden of establishing that its

decision was not based on impermissible criteria.  Id.  "At this stage the defendant's burden is one of

---

[7] That statute provides, in pertinent part, that "[a]ny employer who discharges, lays off or discriminates against an employee regarding [certain employment conditions] ... because of ... religious ideology ... [s]hall incur ... civil liability."  29 L.P.R.A. § 146.

persuasion, not only of production as in Title VII." Colón-Muriel v. Asociación de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio, 499 F.Supp.2d 98, 111 (D.P.R. 2007), *citing* Alvarez-Fonseca, 152 F.3d at 27.

In order to trigger the Law 100 presumption, a plaintiff must prove three elements: (1) that some adverse employment action was taken; (2) that the action was taken without just cause; and (3) that some basic fact exists in the record substantiating the type of discrimination alleged. Hernández v. Trans Oceanic Life Ins. Co., 151 D.P.R. 754, 776 (2000); see also Colón-Muriel, 499 F.Supp.2d at 111; Meléndez v. SAP Andina y Del Caribe, C.A., __ F.Supp.2d __, 2007 WL 2828878, *14 (D.P.R. 2007); Varela Teron v. Banco Santander de P.R., 257 F.Supp.2d 454, 463 (D.P.R. 2003).  Once the plaintiff proves that the employment action was unjust the burden shifts to the employer.[8]  Rodríguez-Torres v. Caribbean Forms Mfr., Inc., 399 F.3d 52, 62 (1st Cir. 2005).  "[I]n order to rebut the Law 100 presumption, the employer must prove, by a preponderance of the evidence, that the challenged action was not motivated by discriminatory ... animus."  Alvarez-Fonseca, 152 F.3d at 27-28.  If the employer proves that its action was justified, the presumption disappears and "the burden of proof on the ultimate issue of discrimination remains with the plaintiff."  Id. at 28.

Here, plaintiffs' allegations and the evidentiary record fall short of triggering the presumption of discrimination.  Importantly, plaintiffs do not even allege that Olivieri's employment was terminated on account of her religion, nor do they allege that Abbott's decision to discontinue her accommodation was based on religion.  (See Docket No. 1, ¶¶ 47-48).  Instead, plaintiffs aver that Abbott "utiliz[ed] the religious convictions and beliefs of Plaintiff as a tool to ... pressure her to leave her job," id. at ¶ 48, but

---

[8]  Abbott avers that Law 100's presumption cannot be activated at the summary judgment stage.  (Docket No. 10, Brief, p. 28).  But this argument finds no support in this district's precedent.  See Meléndez, __F.Supp.2d __, 2007 WL 2828878, at *14 (applying the presumption analysis to Law 100 claim at summary judgment stage); Colón-Muriel, 499 F.Supp.2d at 111 (same).

**Nancy Olivieri, et al. v. Abbott Laboratories, et al.**                                          Page 34
**Civil No. 05-1244 (ADC/BJM)**
**Report and Recommendation**

this averment is not supported by the evidentiary record.  In fact, Abbott investigated her complaint of

religious harassment and attempted repeatedly to accommodate Olivieri, even going so far as offering

her other positions within the company.  (Docket No. 10, Exh. II, ¶ 29; Docket No. 17, Exh. 6, ¶ 41; Exh.

29).  Olivieri, on the other hand, declined to return to work or even to the human resources office for

several months, until Abbott finally terminated her employment after more than a year had passed since

she had last worked.  (Docket No. 10, Exh. II, ¶ 35; Docket No. 17, Exh. 32).[9]  Likewise, plaintiffs have

failed to point to any facts showing religious discrimination as a determining factor in Abbott's

challenged actions.   Absent a presumption of discrimination, and looking at the totality of the

circumstances, there is insufficient evidence of discriminatory animus in regards to the adverse

employment actions for a reasonable jury to find a violation of Law 100.  I therefore recommend that

the motion for summary judgment on the Law 100 claim be **granted** in part.[10]

C.        **Law No. 80**

Abbott moves for summary judgment on the Law 80 claim for unjust dismissal, averring that

Olivieri's termination resulted from her year-long absence from work.  (Docket No. 10, Brief, p. 31).

Plaintiffs counter that Olivieri was constructively discharged by being "forced out of her position at the

---

[9] These same facts would serve to rebut the presumption of discrimination assuming, *arguendo*, there were sufficient facts to trigger it.

[10] Though the parties do not address the issue in their moving papers, plaintiffs may also claim a hostile work environment under Law 100.  See Acevedo Martinez v. Coatings, Inc. and Co., 286 F.Supp.2d 107, 110 n.1 (D.P.R. 2003) (jury verdict form asking, "Do you find ... that defendants ... violat[ed] Law 100 by creating a hostile work environment ... ?").  To the extent that this claim is made by plaintiffs, it survives summary judgment for the same reasons that the Title VII hostile work environment claim survives at this stage in the litigation.  See Figueroa Garcia v. Lilly Del Caribe, Inc., 490 F.Supp.2d 193, 212 (D.P.R. 2007) ("Figueroa's Title VII hostile work environment claim survives ... summary judgment. Consequently, the court concludes that her hostile work environment-based claim under Law[] ... 100 also withstands *brevis* disposition."); Muñoz Rivera v. Walgreens Co., 428 F.Supp.2d 11, 32 (D.P.R. 2006) ("the Magistrate Judge recommended that summary judgment be granted on the Law No. 100 claim but left pending resolution of plaintiff's hostile work environment claim brought under the same statute").

chemical laboratory not only based on false information if not [*sic*] based on discriminatory acts of humiliation," and again cites to a portion of the record containing mostly inadmissible hearsay. (Docket No. 17, Brief, p. 20).

Puerto Rico's Law 80 provides relief to employees who are terminated from employment "without good cause." 29 L.P.R.A. § 185a. The statute provides examples of good cause, and states that "[a] discharge made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment shall not be considered as a discharge for good cause." 29 L.P.R.A. § 185b. The facts here show that the decision to terminate Olivieri's employment was not made on a mere whim. On the contrary, Olivieri's termination followed a long, drawn-out process of Abbott trying to accommodate Olivieri, but without substantial cooperation from Olivieri herself. Abbott scheduled multiple medical evaluations to assess Olivieri's medical condition, offered alternative positions within the company, scheduled meetings with Olivieri to discuss the situation, and waited until she had been absent for more than a year from work before terminating her employment. (See Docket No. 17, Exh. 34). Despite the just cause for termination put forth by Abbott (namely, more than a year of absence from work), plaintiffs do not point to any particular facts which create a genuine factual issue as to Abbott's justification for its decision.

Moreover, plaintiffs' claim of constructive discharge lacks evidentiary support. The undisputed facts in the record show that Olivieri failed to put forth even a minimal effort between the months of January and September 2004 to work with Abbott in order to find a mutually beneficial accommodation. (See Docket No. 17, Exh. 29 (letter inviting Olivieri to meet and discuss alternative position); Docket No. 10, Exh. II, ¶¶ 26-28 (Olivieri failed to show up at two meetings to discuss

position); Docket No. 10, Exh. II, ¶ 29 (Olivieri was offered two alternative positions but refused to

consider them); Docket No. 17, Exh. 6, ¶ 41; Exh. 31 (same); Docket No. 10, Exh. II, ¶¶ 32, 33 (Olivieri

refused to visit the human resources department to investigate open positions, despite being invited to

do so)).  Furthermore, plaintiffs in their opposition point to no admissible supporting facts on this point.

(Docket No. 17, Brief, p. 20).

        Where good cause is shown for an employee's termination, summary judgment in favor of the

employer is appropriate.  See Velázquez Fernández v. NCE Foods, Inc., 405 F.Supp.2d 179, 192-93

(D.P.R. 2005) (granting summary judgment on Law 80 claim where undisputed facts showed good cause

for termination); Soto v. Corp. of the Presiding Bishop of the Church of Jesus Christ of Latter-Day

Saints, 73 F.Supp.2d 116, 131-32 (D.P.R. 1999) (same).   Accordingly, I recommend that Abbott's

motion for summary judgment on the Law 80 claim be **granted**.

        **D.        Articles 1803 and 1803 of the Puerto Rico Civil Code**

        Finally, Abbott moves for summary judgment on plaintiffs' claims under Articles 1802 and

1803 of the Puerto Rico Civil Code.  (Docket No. 10, Brief, pp. 31-32).  Abbott argues that, although

relatives of Olivieri may bring tort claims against it under Article 1802 based on Olivieri's employment

discrimination claim, their claims must fail because summary judgment must be granted on  the

underlying discrimination claim.  Id.  Plaintiffs do not address the tort law claims in their opposition.

        Article 1802 is the general tort statute of the Puerto Rico Civil Code.  Baralt v. Nationwide

Mut. Ins. Co., 183 F.Supp.2d 486, 487 (D.P.R. 2002).  The Puerto Rico Supreme Court in Santini Rivera

v. Serv. Air, Inc., 137 D.P.R. 1, 1994 WL 909527 (1994), created a cause of action under Article 1802

for the relatives of plaintiffs that have suffered discrimination under Law 100.  See Baralt, 183

F.Supp.2d at 487.  "But such a cause of action is wholly derivative and, thus, its viability is contingent upon the viability of the underlying employment discrimination claim." <u>Cabán Hernández v. Philip Morris USA, Inc.</u>, 486 F.3d 1, 12-13 (1st Cir. 2007).  Thus, a grant of summary judgment on the underlying claim justifies summary judgment on the tort claim.  <u>Id.</u> at 13.  Conversely, where an underlying Law 100 claim is upheld on summary judgment, it is proper to likewise uphold the Article 1802 claim.  <u>See</u> <u>Torres Ramos v. Metro Guard Serv., Inc.</u>, 394 F.Supp.2d 465, 469-70 (D.P.R. 2005) (denying summary judgment on Article 1802 claim because the underlying employment discrimination claim was upheld); <u>Adams v. Corp. Realty Serv., Inc.</u>, 190 F.Supp.2d 272, 279 (D.P.R. 2002) (same). Here, plaintiffs' Law 100 claim should be dismissed except as to a claim for hostile work environment. Accordingly, I recommend that Abbott's motion for summary judgment on the derivative tort claims be **granted**, except to the extent that they relate to the hostile work environment claim.

## CONCLUSION

In view of the foregoing, I recommend that Abbott's Motion for Summary Judgment be **GRANTED** as to the ADA claim, the Title VII retaliation claim, and the Puerto Rico law claims (except for hostile work environment), and **DENIED** as to the Title VII hostile work environment claim.

The parties have ten (10) business days to file any objections to this report and recommendation. <u>See</u> Local Rule 72(d); 28 U.S.C. § 636(b)(1).  Failure to file same within the specified time waives the right to appeal this order. <u>Henley Drilling Co. v. McGee</u>, 36 F.3d 143, 150-151 (1st Cir. 1994); <u>United States v. Valencia</u>, 792 F.2d 4, 6 (1st Cir. 1986); <u>see also</u> <u>Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.</u>, 840 F.2d 985, 991 (1st Cir. 1988) ("Systemic efficiencies would be frustrated

**Nancy Olivieri, et al. v. Abbott Laboratories, et al.**                                    Page 38
**Civil No. 05-1244 (ADC/BJM)**
**Report and Recommendation**

and the magistrate's role reduced to that a mere dress rehearser if a party were allowed to feint and

weave at the initial hearing, and save its knockout punch for the second round").

      **IT IS SO RECOMMENDED**.

      In San Juan, Puerto Rico, this 15th day of October, 2007.


                    **S/Bruce J. McGiverin**
                    BRUCE J. McGIVERIN
                    United States Magistrate Judge