## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

NANCY OLIVIERI, et al.,
    Plaintiffs,

    v.

ABBOTT LABORATORIES, et al.,
    Defendants.

Civil No. 05-1244 (ADC)

## OPINION AND ORDER

On March 4, 2005, plaintiffs, Nancy Olivieri ("Olivieri"), Carlos J. Miranda, their Conjugal Partnership, and their minor children Carlos, Caleb, Isai, Lemuel and Kemuel Miranda Olivieri ("plaintiffs"), filed this action against defendants, Abbot Laboratories, and Abbott Jayuya Operations ("defendants"),[1] seeking relief for alleged violations of Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 *et seq.* ("ADA"), Title VII of the Civil Right Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the following Puerto Rico laws: Law No. 80 of May 30, 1976, 29 L.P.R.A. § 185a *et seq.* ("Law 80"); Law No. 44 of July 2, 1985, 1 L.P.R.A. § 501 *et seq.* ("Law 44"); Law No. 100 of June 30, 1959, 29 L.P.R.A. 146 *et seq.* ("Law 100"); and Articles 1802 and 1803 of the Puerto Rico Civil Code, 31 L.P.R.A. §§ 5141 and 5142 ("Article 1802 and 1803") (**Docket No. 1**).

Now before the Court are plaintiffs' and defendants' objections (**Docket Nos. 48 & 49**) to the Report and Recommendation ("R&R") (**Docket No. 46**) issued by Magistrate-Judge, Bruce J. McGiverin ("Magistrate-Judge" or "Magistrate-Judge McGiverin") on October 15, 2007, which recommended granting in part and denying in part defendants' motion for summary judgment (**Docket No. 10**).  After reviewing the R&R, objections, pleadings, statements of fact, and exhibits (**Docket Nos. 10, 14, 17, 21, 25, 28, 46, 48, 49 & 52**), the Court adopts the R&R, thereby granting defendants' motion for summary judgment in part and denying in part.

---

[1] Plaintiffs also sued unnamed individuals and unnamed insurance companies (**Docket No. 1**).

## I.      Factual and Procedural Background

To the extent the parties do not object to the Magistrate-Judge's factual discussion, the Court culls the relevant facts from the R&R (**Docket No. 46**).

### 1.      Pre-harassment Treatment

Olivieri began working at Abbott[2] on July 7, 1987, as a chemist[3], and by 1990, due to her repeated exposure to certain chemicals, had developed recurrent laryngotracheal bronchitis (the "condition"). **Docket No. 17**, Exh. 6, at ¶¶ 2-3.  Her condition was not permanent.  **Docket No. 10**, Exh. I, at 69-70.  The condition caused an irritation of the respiratory system making breathing difficult.  *Id.* at 68.  It prohibited her from performing tasks where she was directly exposed to certain chemicals.  Otherwise, she could perform all other tasks.  *Id.* at 80, 83.  For example, it affected her at home when cleaning the bathroom, but did not prohibit her from performing other household tasks that did not involve exposure to chemicals such as taking care of her children, taking them to school, driving, sweeping, mopping, dishwashing, and washing clothes.  *Id.* at 78-80.

On November 21, 1990, Abbott referred Olivieri to the State Insurance Fund for treatment of her condition.  **Docket No. 10**, Exh. VI, at ¶ 5.  The treating physician recommended that she not be exposed to chemical vapors at work, and that she be relocated to a work area where she would not be exposed to chemicals.  *Id.*; **Docket No. 21**, Exh. 10. Notwithstanding Olivieri's job as a chemist, after this visit and the resulting recommendation, she was no longer required to deal directly with chemicals, and was asymptomatic until 1999. **Docket No. 17**, Exh. 6, at ¶¶ 8-10; Exh. 12.  In 1999, after discussing her condition with her supervisor, Bernice Irizarry ("Irizarry"), Abbott referred Olivieri to Dr. Héctor Rosado-Toledo

---

[2] When Olivieri began working at the laboratory, the employer was Boots Pharmaceuticals. Boots Pharmaceuticals was subsequently acquired by BASF Pharmaceutical, which was acquired by Abbott Laboratories in 2001. **Docket 10, Exh. II**, at ¶¶ 3-4.  For the sake of clarity, her employer will be referred to as Abbott throughout.

[3] This title was subsequently changed to Laboratory Technician when Abbott acquired the laboratory. **Docket No. 10**, Exh. 1, at 43.

("Dr. Rosado") who concluded that Olivieri had a "severe reaction" to some of the chemicals in the laboratory, that she had been asymptomatic since 1991 because she had not been exposed to chemicals since that time, and that she could perform her job adequately as long as she was not exposed to chemicals. **Docket No. 10**, Exh. V, at 23; **Docket No. 17**, Exh. 12. As previously done, Abbott excused Olivieri from all chemical related work, and assigned her to work specifically at the T3 and Document Review areas. **Docket No. 17**, Exh. 6, at ¶¶ 12-13. From 1999 to 2003, Olivieri did not work with chemicals.

### 2.        Religious Harassment Complaints

In late May of 2003, Olivieri informed Irizarry that she had been subjected to religious harassment by co-workers. **Docket No. 17**, Exh. 6, at ¶ 16. Olivieri told Irizarry that her co-workers mocked her religion and harassed her on numerous occasions by: (1) sarcastically saying to each other – within earshot of her – "Come on, we are going to pray"; (2) mock speaking in tongues while putting a hand on a co-worker; (3) singing a religious song in her presence, but changed the lyrics from "there is no God as big as you" to "there is no better rum than Don Q,"; and (4) scratching her religious music CDs. **Docket No. 10**, Exh. IV, at 15, 19-20; **Docket No. 10**, Exh. III, at 44; **Docket No. 17**, Exh. 6, at ¶ 16.[4]

In response to the complaint, Abbott conducted an investigation, during which several employees, including Olivieri and four of her co-workers, were interviewed by the Human Recourse Director, Miriam Bayron ("Bayron"). **Docket No. 10**, Exh. II, at ¶¶ 11-13. The investigation concluded on July 3, 2003, with Bayron determining that while she could not confirm that Oliveri had been harassed because of her religion, inappropriate discussions regarding religion and politics had occurred amongst the employees in the laboratory. *Id.* at ¶ 14; **Docket No. 17-1**, at 1 (conceding paragraph 65 of Abbott's statement of uncontested material facts). As a result, Abbott sent out memoranda to all laboratory employees requesting that they refrain from discussing controversial subjects such as religion and

---

[4] Another incident consisted of a discussion between Olivieri and a co-worker, Lymaris, over whether Catholics prayed, after which Lymaris became upset. **Docket No. 10**, Exh. IV, pp. 14-15.

politics. **Docket No. 10**, Exh. II, at ¶ 14; Exh. II, at exhs. L, M, O, P, Q, R, S.  In addition, several meetings were arranged  between the supervisors and the employees to discuss how to improve the work environment, and an outside speaker was brought in to give lectures on teamwork and workplace dynamics. **Docket No. 10**, Exh. II, at ¶ 15; Exh. III, at 47.

In August of 2003, Olivieri discovered that someone had altered her work samples. **Docket No. 10**, Exh. IV, at 16.  Olivieri spoke with her Supervisor, Elbin Rivera ("Rivera"), who told her to "pass the word on to see if anyone knows about" it.  *Id.*  Shortly thereafter, Olivieri was approached by a co-worker, Lymaris, and talked with her about the incident. *Id.* at 16. Unbeknownst to Olivieri, Lymaris understood her to be accusing another co-worker, Lumarie, of tampering with her work sample.  *Id.* at 16-19.  In due course, Lumarie heard about the alleged accusation and reported it to Bayron.  *Id.*  Bayron investigated the incident, but found that Olivieri had not improperly accused anyone of tampering with her work samples.  **Docket No. 17**, Exh. 2, at 17; Exh. 6, at ¶ 19.  Notwithstanding Bayron's determination, Olivieri suffered depression and anxiety and was out of the office from August 20, 2003, until September 1, 2003. **Docket No. 10**, Exh. I, at 120; Exh. II, at ¶ 19.

**3.        Rotating Work-Schedule, Loss of Accommodation, and Interactive Process**

On August 19, 2003, the head of the chemical laboratory issued a memorandum setting forth a new rotating work schedule. **Docket No. 21**, Exh. 14.  As part of the revised work schedule, Olivieri was required to rotate through all jobs, including those involving exposure to chemicals. *Id.*  Upon returning to the office from her stress and depression related absence, Olivieri learned of the "new" rotating work schedule and told Rivera that she could not be exposed to chemicals. **Docket No. 10**, Exh. I, at 126-27; **Docket No. 17**, Exh. 6, at ¶ 21.  In response, he instructed her to remain at her current non-chemical exposing position until she talked to someone from Human Resources. **Docket No. 10**, Exh. I, at 126-27; **Docket No. 17**, Exh. 6, at ¶ 21.  While performing her tasks, a co-worker who had previously been working with raw materials, entered the area in which Olivieri was working and remained there for over an hour. **Docket No. 17**, Exh. 6, at ¶ 24.  As a result of this encounter, she was exposed

to ether from a co-worker's lab coat.  *Id.*; **Docket No. 21**, Exh. 21.  This exposure aggravated her condition. **Docket No. 17**, Exh. 6, at ¶ 25.

Subsequently, Olivieri spoke with Bayron, who instructed her to meet with a doctor to evaluate her medical condition and how to best accommodate her. **Docket No. 10**, Exh. I, at 128-29; **Docket No. 21**, Exhs. 15, 16.  On September 4, 2003, Dr. Andrés Fuentes ("Dr. Fuentes"), Abbott's occupational doctor, consulted by phone with Abbot about Olivieri. **Docket No. 21**, Exh. 17.  During the consultation, Dr. Fuentes reported to Abbott that all of Olivieri medical evaluations coincided, that Olivieri should be kept out of areas where she would be exposed to chemicals, and that she should see a pneumologist.  *Id.*  Olivieri was then referred to a pneumologist, Dr. Chardón, who recommended that she not be exposed to chemicals or gasses. **Docket No. 10**, Exh. I, at 130; Exh. V, at 32; **Docket No. 21**, Exh. 19. Dr. Benítez reviewed this evaluation and concurred, adding that further chemical exposure could lead to Olivieri developing occupational asthma. **Docket No. 10**, Exh. V, at 33; **Docket No. 21**, Exh. 20.  Olivieri was then referred to Dr. Fuentes, Dr. Benitez's supervisor, for an additional evaluation.  **Docket No. 10**, Exh. I, at 147-48.  During this evaluation, Olivieri perceived some of Dr. Fuentes' questions to be "personal" in nature and refused to let him complete the evaluation.  **Docket No. 10**, Exh. I, at 148-49; **Docket No. 10**, Exh. II, at ¶ 23.

In November of 2003, Dr. Chardón allegedly said that Olivieri could try working in the laboratory using a respirator.  **Docket No. 21**, Exh. 23, 24; **Docket No. 17**, Exh. 25.  In or around this same time, when the idea of using a respirator was proposed to Olivieri, she refused by asserting that in 1999 Dr. Rosado had informed her that using a respirator or respiratory mask would not guarantee relief for her condition if exposed to chemicals. **Docket No. 21**, Exh. 26.[5]  In December of 2003, Dr. Chardón was again questioned by Abbott about the viability of Olivieri working with a respirator. **Docket No. 21**, Exh. 27, 28.  On January 20, 2004, Abbott sent Olivieri a letter stating, "[p]ursuant to the evaluation performed

---

[5] On November 17, 2003, Olivieri filed a complaint with the E.E.O.C. **Docket No. 10**, Exh. 6, at ¶ 38.

by Dr. Chardón, your condition does not allow you to perform the essential functions of your position. The doctor certifies that the condition you suffer does not allow you to work as Laboratory Technician III using a respirator." **Docket No. 17**, Exh. 29.  The letter went on to state that "[i]n order to seek an accommodation to this situation, a vacant position has been identified in the Engineering Department, which you could occupy if you are able to perform, with or without accommodation, the essential functions of the same."

This written communication invited Olivieri to meet with Bayron on January 23, 2004. *Id.*  Because Olivieri did not receive this letter in a timely fashion, she did not attend the meeting.  **Docket No. 10**, Exh. II, at ¶ 26.  The two then rescheduled their meeting for February 3, 2004.  *Id.*  Olivieri again failed to show up, stating later that she had been sick. *Id.* at ¶ 28.  The meeting was rescheduled for February 17, 2004.  *Id.*  On February 17, 2004, Bayron and Oliveri met, wherein they discussed the possibility of Olivieri filling an application for an open Engineering Clerk or Quality Technician position as an accommodation.  *Id.* at ¶ 29.  Olivieri refused to consider either position because they had lower pay, and required her to submit an application.  *Id.*; **Docket No. 17**, Exh. 6, at ¶ 41; Exh. 31.  On March 9, 2004, Bayron sent Olivieri a letter stating, amongst other things, that since Olivieri could not perform her job with the aid of a respirator and because Olivieri had not suggested any alternative accommodation, Abbott could no longer leave her position vacant. **Docket No. 17**, Exh. 31.  The letter both asked her to once again visit her doctor so as to find a way to allow her to return to her position, and invited her to visit Abbott's Human Resources Department weekly to review available positions.  *Id.*  Olivieri visited the laboratory one time following the March 9, 2004 letter. **Docket No. 10**, Exh. II, at ¶¶ 32-33. After a one (1) year absence, Abbott terminated Olivieri's employment on September 2, 2004. *Id.* at ¶ 35; **Docket No. 17**, Exh. 32.

### 4.     Post-Termination History

On March 4, 2005, Olivieri brought this action for disability and religious discrimination and harassment, and unjust termination. **Docket No. 1**.  On June 20, 2005,

defendants filed an answer and asserted a series of affirmative defenses. **Docket No. 5**. On March 3, 2003, defendants filed a motion for summary judgment. **Docket No. 10**. In their motion, defendants argued that Olivieri failed to establish a cause of action for disability and/or religious discrimination, harassment, retaliation and unjust termination. *Id.* Additionally, defendants argued that none of Abbott's various decisions were motivated by either Olivieri's alleged disability or religious ideologies, but by legitimate businesses reasons. **Docket No. 10**. On May 30, 2007, this motion was referred to Magistrate-Judge McGiverin for a R&R. **Docket No. 42**.

On October 15, 2006, Magistrate-Judge McGiverin issued a R&R wherein he recommended that defendants' motion for summary judgment be granted in part and denied in part. **Docket No. 46**. Specifically, the Magistrate-Judge recommended that: (1) plaintiffs' ADA claim be dismissed because plaintiffs failed to raise a genuine issue of material fact as to whether Olivieri was disabled, and, alternatively, that she was "regarded as" disabled by Abbott; (2) plaintiffs' hostile work environment claim based upon religious harassment survived because a reasonable jury could conclude that Olivieri's co-workers were motivated by religious hostility when harassing Olivieri, and that the harassment was severe and pervasive under Title VII; (3) plaintiffs' Title VII retaliation claim be dismissed because no reasonable jury could find the required casual connection between Olivieri's protected activities and Abbott's adverse employment actions; (4) plaintiffs' Law 44 claim, much like her ADA claim, failed to raise a genuine issue of material fact as to Olivieri's disability under Law 44; (5) plaintiffs' Law 100 claim be dismissed because they failed to point to any facts showing religious discrimination as a determining factor in Abbott's decision to terminate Olivieri; (6) plaintiffs' Law 80 claim be dismissed because Abbott was able to show "good cause" for its termination of Olivieri; and (7) plaintiffs' Article 1802 and 1803 derivative claims be dismissed, except as to the extent they relate to the surviving hostile work environment claim under Law 100. *Id.* On October 30, 2007, defendants filed timely objections. **Docket No. 48**. No opposition to defendants objections to the R&R have been filed. However, on

October 31, 2007, plaintiffs filed timely objections to the R&R, which defendants opposed. **Docket Nos. 49 & 52.**

## II.     Standard of Review for Objections to a Report and Recommendation

A District Court may refer pending motions to a magistrate-judge for a report and recommendation. *See* 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); Loc. Rule 72(a). Any party adversely affected by the recommendation issued may file written objections within ten days of being served with the report and recommendation. *See* 28 U.S.C. § 636(b)(1). A party that files a timely objection is entitled to a *de novo* determination of "those portions of the report or specified proposed findings or recommendations to which specific objection is made." *Sylva v. Culebra Dive Shop*, 389 F. Supp.2d 189, 191-92 (D.P.R. 2005) (citing *United States v. Raddatz*, 447 U.S. 667, 673 (1980)). Failure to comply with this rule may preclude further review by the district court and the court of appeals. *See Santiago v. Cannon U.S.A. Inc.*, 138 F.3d 1, 4 (1st Cir. 1998); *Davet v. Maccorone*, 973 F.2d 22, 30-31 (1st Cir. 1992). Similarly, a party objecting to a report and recommendation is "not entitled to a de novo review of an argument never raised" before the magistrate-judge. *Borden v. Sec. of Health and Human Svcs.*, 836 F.2d 4, 6 (1st Cir. 1987).

In conducting its review, the Court is free to "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate-judge." 28 U.S.C. § 636 (a)(b)(1)*; see also Templeman v. Cris Craft Corp.*, 770 F.2d 245, 247 (1st Cir. 1985); *Alamo Rodríguez v. Pfizer Pharmaceuticals, Inc.*, 286 F. Supp.2d 144, 146 (D.P.R. 2003). Hence, the Court may accept those parts of the report and recommendation to which the plaintiff does not object. *See Hernández-Mejías v. General Elec.*, 428 F. Supp.2d 4, 6 (D.P.R. 2005) (citing *Lacedra v. Donald W. Wyatt Detention Facility*, 334 F. Supp.2d 114, 125-26 (D.R.I. 2004)).

## III.    Summary Judgment Standard

Summary judgment is appropriate when the evidence before the court shows "that there is no genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." *Seaboard Sur. Co. v. Greenfield Middle Sch. Bldg. Comm.*, 370 F.3d 215, 218 (1st Cir. 2004). When ruling on a motion for summary judgment, the court "must scrutinize the evidence in the light most agreeable to the nonmoving party, giving that party the benefit of any and all reasonable inferences." *Cox v. Hainey*, 391 F.3d 25, 27 (1st Cir. 2004). The court may safely ignore "conclusory allegations, improbable inferences, and unsupported speculation." *Suárez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 53 (1st Cir. 2000) (quoting *Medina-Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). In addition, the "absence of evidence on a critical issue weighs against the party – be it either the movant or nonmovant – who would bear the burden of proof on that issue at trial." *Alamo-Rodríquez v. Pfizer Pharma.*, 286 F. Supp. 2d 144, 151 (D.P.R. 2003) (citing *Pérez v. Volvo Car Corp.*, 247 F.3d 303, 310 (1st Cir. 2001)).

An issue is "genuine" for purposes of summary judgment if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and a "material fact" is one which "might affect the outcome of the suit under the governing law." *Hayes v. Douglas Dynamics, Inc.*, 8 F.3d 88, 90 (1st Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

The nonmovant bears "the burden of producing specific facts sufficient to deflect the swing of the summary judgment scythe." *Mulvihill v. Top-Flite Golf Co.*, 335 F.3d 15, 19 (1st Cir. 2003). Those facts, typically set forth in affidavits, depositions, and the like, must have evidentiary value. As a rule, "[e]vidence that is inadmissible at trial, such as inadmissible hearsay, may not be considered on summary judgment." *Vázquez v. López-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). Finally, it is well settled that "[t]he mere existence of a scintilla of evidence" is insufficient to defeat a properly supported motion for summary judgment. *Anderson*, 477 U.S. at 252.

## IV.   Defendants' Objections

The Magistrate-Judge recommended, with regards to plaintiffs' hostile work environment claims, that summary judgment be denied because a reasonable jury could conclude that Oliveri's co-workers were motivated by religious hostility when they harassed

her, and that the harassment amounted to "extreme" conduct that altered the terms and conditions of Olivieri's employment. Defendants object to this recommendation on the grounds that: (1) there is no evidence on the record to support a finding that the hostility directed towards Olivieri was due to her religious ideology; (2) that the Magistrate-Judge improperly relied on two events – the scratched CD and the altered work sample – because there was no evidence that these incidents were motivated by religious animus; and (3) plaintiffs' allegations do not rise to the level of "severe and pervasive" so as to alter the conditions of her employment. **Docket No. 48**. After reviewing the record in a light most favorable to plaintiffs, this Court concurs with the recommendation of the Magistrate-Judge.

> To succeed on a hostile work environment claim under Title VII, a plaintiff must show:

> (1) she is a member of a protected class; (2) she was subject to uninvited harassment; (3) the offending conduct was *because of her religion;* (4) the harassment was severe and pervasive; (5) the offending conduct was both objectively and subjectively offensive and (where employer liability is sought); (6) there was a basis for such liability.

*Rivera v. Puerto Rico Aqueduct and Sewers Authority*, 331 F.3d 183, 189 (1st Cir. 2003). "In hostile environment cases, the fourth and fifth elements are typically the most important." *O'Rourke v. City of Providence*, 235 F.3d 713, 728 (1st Cir. 2001). "They must be determined by the fact-finder in light of the record as a whole and the totality of the circumstances." *Id.* (internal citation and quotations omitted). "Several factors typically should be considered in making this determination: the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* at 729 (internal citation and quotations omitted). A plaintiff can prove the existence of a hostile work environment by showing that "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citation and quotations omitted). As explained by the Supreme Court, "[the] conduct must be extreme to amount to a change in the terms and conditions of

employment;" the standard is "sufficiently demanding to ensure that Title VII does not become a general civility code." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (internal citation and quotations omitted). When applied properly, these standards will filter out complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing. *Id.* Here, only the third and fourth prong (religious animus and whether the actions were sever and pervasive) of the analysis are in dispute, therefore the discussion is limited accordingly.

### 1.    Religious Animus

Notwithstanding defendants' objections, and averments to the contrary, the evidence set forth in the record, might, if proven at trial, support plaintiffs' religious harassment claim. The evidence could support a finding that on numerous occasions Olivieri's co-workers made sarcastic religious statements, mockingly spoke in tongues[6], changed the lyrics in one of Olivieri's religious songs so it referenced rum, destroyed her religious CDs, and tampered with some of her work samples due to her religious beliefs. **Docket No. 17**, Exh. 6.

Defendants contend that the Magistrate-Judge erred in considering these final two events because Olivieri does not know who committed them, or why. This Court does not agree. As the First Circuit has held, alleged conduct that is not explicitly discriminatory, in appropriate circumstances, may be considered along with the other overtly discriminatory conduct in assessing the validity of a Title VII harassment claim. *See Landrau-Romero v. Banco Popular De Puerto Rico*, 212 F.3d 607, 614 (1st Cir. 2000) ("Alleged conduct that is not explicitly racial in nature may, in appropriate circumstances, be considered along with more overtly discriminatory conduct in assessing a Title VII harassment claim."); *O'Rourke*, 235 F.3d at 713 (to discount these non-religious based incidents would "def[y] the [Supreme Court's] directive to consider the totality of circumstances in each case and 'rob[s] the incidents of their cumulative effect'"). There is no doubt that the actions undertaken by Olivieri's co-workers

---

[6] Defendants' attempt to discount this particular incident because Olivieri "did not even know" what "those 'angelical languages' meant" is troublesome, and will not be entertained by this Court. **Docket No. 48**, at 7. As the referenced exhibit makes clear, it was not *what* was said that was offensive, but the fact that Olivieri's co-workers were mock "speaking in tongues" at all that was offensive.

were executed in her presence and that some of these actions caused physical damages to her property.

Looking at the totality of the circumstances, the Court finds the evidence in the record to be sufficient for a reasonable jury to conclude that (not to mean that the jury has to) the actions taken against Olivieri were motivated by religious animus. We must, of course, consider the evidence and all reasonable inferences derived therefrom in the light most favorable to plaintiffs. *See Buenrostro v. Collazo,* 973 F.2d 39, 41 (1st Cir. 1992).[7] Accordingly, plaintiffs have met the third prong of the harassment claim test.

### 2.      Severe and Pervasive

Defendants further contend that the harassment directed towards Olivieri was neither "severe" nor "pervasive" enough to meet the fourth prong of the hostile work environment test. To succeed on their hostile work environment claim, plaintiffs must demonstrate, *inter alia,* that the complained-of conduct was so severe or pervasive that it altered the terms or conditions of Olivieri's employment. *Pomales v. Celulares Telefónica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006) (citing *Lee-Crespo v. Schering-Plough Del Caribe, Inc.,* 354 F.3d 34, 46 (1st Cir. 2003)). "'There is no mathematically precise test to determine whether [a plaintiff] presented sufficient evidence' that she was subjected to a severely or pervasively hostile work environment." *Id.* (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003)).

---

[7] For the reasons set forth above, the Court disagrees with defendants contention that the case at bar should be decided in the same manner as was *Rivera*, 331 F.3d at 189. The facts of this case differ significantly from those of *Rivera*. In *Rivera*, the court found that the work environment itself was uncivil and offensive, and that plaintiff was singled out and harassed because she disagreed with her co-workers' behavior and stated as much, not because of her religious beliefs. *Id.* at 191. Here, on the other hand, the record set forth no admissible evidence to support a finding that other workers at Abbott were subjected to an uncivil work environment that was unrelated or even somehow related to religious discrimination. In fact, the evidence on record also points to at least one altercation between Olivieri and a co-worker because of religious disagreements. More so, Abbott's investigation concluded that "inappropriate discussions pertaining to religion and politics were taking place in the laboratory." **Docket No. 17**, Exh. 2, at ¶ 14. This finding prompted Abbott to send communications to its employees prohibiting and refraining them from religious motivated discussions. Accordingly, here, unlike in *Rivera*, a reasonable jury could conclude that Olivieri was subjected to harassment because of her religious ideologies.

Accordingly, the Court examines all attendant circumstances, including, but not limited to, the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance.  *Id.* (citing *O'Rourke,* 235 F.3d at 729). "'Subject to some policing at the outer bounds,' it is for the jury to weigh those factors and decide whether the harassment was of a kind or to a degree that a reasonable person would have felt that it affected the conditions of her employment. *Marrero v. Goya of P.R., Inc.,* 304 F.3d 7, 19 (1st Cir. 2002) (citing *Gorski v. N.H. Dep't of Corrections,* 290 F.3d 466, 474 (1st Cir. 2002)).

Here, while a close question, Olivieri has demonstrated sufficient severity and pervasiveness to overcome defendants' motion for summary judgment.  First, with respect to the frequency of the harassing conduct, Olivieri testified that two of her co-workers made mocking comments, spoke in tongues and sang a religious song with altered words on numerous occasions. *See* **Docket No. 10**, Exh. IV, at 20.  While it is arguable whether these incidents, standing alone,  rise to the level of significantly altering Olivieri's conditions of employment, *Faragher,* 524 U.S. at 788, coupled with the other allegations – destruction of her personal property and the sabotage of her work samples – tip the scales in plaintiffs' favor. Moreover, there is evidence that Olivieri complained about her alleged mistreatment to Abbott not once, but at least two  occasions, and that she suffered emotional harm as a result of the harassment. **Docket No. 17**, Exh. 6, at ¶¶ 16, 18, 20.  Accordingly, the harassment appears to have significantly altered Olivieri's ability to work and her working conditions. Finally, while not contested, it is clear that Olivieri subjectively felt harassed by her co-workers.  **Docket No. 10**, Exh. IV, p. 17-18; **Docket No. 17**, Exh. 6, at ¶ 16).

This evidence – while notably sparse – is sufficient to allow plaintiffs to present their harassment claim to a jury.  The determination regarding whether defendants' alleged conduct was sufficiently "severe" or "pervasive" requires a fact intensive analysis and will involve assessing the weight of evidence and credibility of witnesses.  Due to its nature, this question is better resolved by a jury at trial, not by the court at the summary judgment stage.

*See Figueroa-García v. Lilly Del Caribe, Inc.*, 490 F. Supp.2d 193, 204-05 (D.P.R. 2007).

Consequently, defendants' motion for summary judgment as to plaintiffs' Title VII and Law 100 hostile work environment claims is DENIED.[8]

## V.  Plaintiffs' Objections

Plaintiffs object to the Magistrate-Judge's recommendation that summary judgment be granted with regards to their ADA, Title VII retaliation, and Puerto Rico law claims, mainly arguing that the Magistrate-Judge failed to consider essential facts in reaching his conclusions. **Docket No. 49**. In response, defendants aver that the Magistrate-Judge's ruling with regards to the recommended dismissal of the above claims were fully supported by the record and should stand. **Docket No. 52**. The Court will address plaintiffs' objections to each recommendation in turn.

### 1.  ADA Claim

The Magistrate-Judge, after viewing the evidence in a light most favorable to plaintiffs, determined that plaintiffs had not put forth evidence on which a trier of fact could reasonably conclude that Abbott viewed her as unable to perform a class of jobs or a broad range of jobs in various classes. **Docket No. 46**, at 19. In response, plaintiffs argue that the Magistrate-Judge failed to properly consider certain facts in determining that Olivieri was not disabled within the meaning of section 12102(2)(C) – "being regarded as having such an impairment" ("regarded-as" claim).[9] Specifically, plaintiffs argue that Abbot regarded Olivieri as disabled

---

[8] As explained by the Magistrate-Judge (**Docket No 46**, at 34, n. 10), and now adopted by this Court, for the same reasons that plaintiffs' Title VII hostile work environment claim survives defendants' motion for summary judgment, plaintiffs' Law 100 hostile work environment claim likewise survives. *See Figueroa García v. Lilly Del Caribe, Inc.*, 490 F. Supp.2d 193, 212 (D.P.R. 2007); *Muñoz Rivera v. Walgreens Co.*, 428 F. Supp.2d 11, 32 (D.P.R. 2006); *Monteagudo v. Asociacion de Empleados Del Estado Libre Asociado de Puerto Rico*, 425 F. Supp.2d 206 (D.P.R. 2006).

[9] It does not appear that plaintiffs are challenging the Magistrate-Judge's determination that Olivieri was not a disabled person pursuant to 42 U.S.C. § 12102(2)(A), only that Abbott regarded her as such, and therefore, should not now be able to escape liability pursuant to 42 U.S.C. § 12102(2)(C). However, to the extent plaintiffs intended to challenge this recommendation, it would be futile. As thoroughly explained by the Magistrate-Judge, Olivieri was unable to produce facts which showed that

(continued...)

within the meaning of ADA.  After conducting a thorough review of the record,  the Court agrees with the Magistrate-Judge.[10]

The Supreme Court has explained that "a person is 'regarded as' disabled within the meaning of the ADA if a covered entity mistakenly believes that the person's actual, nonlimiting impairment substantially limits one or more major life activities." *Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 521-22 (1999).  In such a situation, "[a]n employer runs afoul of the ADA when it makes an employment decision based on a physical or mental impairment, real or imagined, that is regarded as substantially limiting a major life activity." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 490 (1999).

As explained by the First Circuit, "[a] plaintiff claiming that [she] is 'regarded' as disabled cannot merely show that [her] employer perceived [her] as *somehow* disabled; rather,

_____

 (...continued)

her impairment substantially limited a major life activity.  In fact, according to Olivieri's own deposition testimony, her only limitations were that she could not clean the bathrooms in her house, take part in any chore or activity where she was exposed to certain chemicals, **Docket No. 10**, Exh. 1, at 79-80, or perform tasks at her job involving direct exposure to certain chemicals (*Id.* at 80, 83).  *See Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 202 (2002) (holding that specific household chores do not normally rise to the level of a "major life activity").  Besides these limitations, plaintiffs point to no other "major life activities" which Olivieri's impairment affects.  Moreover, even if the Court assumes, *arguendo*, that "working" is a major life activity, plaintiffs failed to demonstrate that Olivieri's impairment interferes with her ability to work because she made no effort to show that he impairments impeded her from performing a broad range of jobs..  *See Maulding v. Sullivan*, 961 F.2d 694, 698 (8th Cir. 1992) (upholding a district court's finding that an ailment that prevents a plaintiff from performing lab work does not substantially limit a plaintiff's employment as a whole).  Accordingly, the Court agrees with the Magistrate-Judge, and concludes that Olivieri is not disabled within the meaning of the ADA because, though physically impaired, she has not adduced sufficient evidence that she is substantially limited in any major life activity so as to create a material dispute of fact.  Actually, there is evidence reflecting that Olivieri refused to participate in the process intending to identify other tasks or jobs she could perform.

[10] The Court notes that plaintiffs have made a series of objections regarding Olivieri's reasonable accommodations, harassment, and discriminations claims, arguing that the Magistrate-Judge failed to consider numerous facts.  However, since we agree with the Magistrate-Judge's conclusion that Olivieri was neither "disabled" nor "regarded as" disabled under the ADA, the Court will not address these arguments.  *See Katz v. City Metal Co., Inc.*, 87 F.3d 26, 30 (1st Cir. 1996) (explaining that in order to establish a claim for disability discrimination under the ADA, plaintiff must first prove "that he was disabled within the meaning of the Act").

[she] must prove that the employer regarded [her] as disabled *within the meaning of the ADA.*" *Bailey v. Georgia-Pacific Corp.*, 306 F.3d 1162, 1169 (1st Cir. 2002) (citing *Giodano v. City of N.Y.*, 274 F.3d 740, 748 (2d Cir. 2001)) (emphasis in original). Therefore, since Olivieri contends that Abbott perceived her as disabled under the ADA, she must show that she "was perceived as being unable to work in either a class of jobs or a broad range of jobs in various classes as compared with the average person having comparable training, skills, and abilities." *Id.* at 1169-70 (citing 29 C.F.R § 1630.2(j)(3)(I)).

Here, as pointed out by the Magistrate-Judge, it is evident that Abbott was aware of Olivieri's condition, and viewed her as unable to meet certain essential requirements of her job; namely, working with chemicals. **Docket No. 17**, Exh. 1 at 73, 115-17; Exh. 3, at 4-5; Exh. 6, at ¶ 10; Exh. 12; Exh. 13; Exh. 29; **Docket No. 21**, Exh. 7. Further, the evidence shows that Abbott attempted to work around Olivieri's limitations by providing her with certain accommodations. **Docket No. 17**, Exh, 1, at 115; Exh. 6, at ¶¶ 13-15; Exh. 29; **Docket No. 21**, Exh. 7. However, the record is void of any evidence that Abbott viewed Olivieri as unfit to perform a broad range of jobs. Actually, from 1990 through 2003 she was not required to work with chemicals, while working for Abbott in different areas. At best, the evidence supports a finding that Abbott regarded Olivieri as unable to perform the tasks required for the Laboratory Technician position, but that they attempted to get Olivieri to apply for other positions within the company in which they felt she could perform. **Docket No. 10**, Exh. II, at ¶ 29; **Docket No. 17**, Exh. 6, at ¶ 41; Exh. 29; Exh. 32. Since plaintiffs have failed to put forth evidence showing that Abbott thought Olivieri was unfit for a broad range of jobs, the Court finds that no reasonable jury could conclude that Olivieri was regarded as disabled by Abbott pursuant to the ADA.[11] *See Murphy v. United Parcel Serv., Inc.*, 527 U.S. 516, 524 (1999)

---

[11] Further, plaintiffs' argument that this Court must accept that Abbott regarded her as disabled because they provided Olivieri with specific tasks which did not involve being in contact with chemicals that irritated her condition is misguided. *See Keith v. Ashland, Inc.*, 205 F.3d 1340, No. 98-4539, 2000 WL 178389, *4 (6th Cir. Feb. 8, 2000) ("To hold that an employer perceives a troubled employee as disabled under the ADA by making an offer to accommodate such an employee 'would unnecessarily inhibit

(continued...)

(summary judgment is proper where plaintiff claiming violation of the ADA fails to show that he is "regarded as unable to perform a class of jobs"); *Whitlock v. Mac-Gray, Inc.*, 345 F.3d 44 (1st Cir. 2003) (explaining that in order to support a "regard as" claim, plaintiff must come forward with evidence that the employer perceived plaintiff as precluded from more than a particular job); *Bailey*, 306 F.3d at 1170 (affirming summary judgment where plaintiff failed to adduce evidence that his employer thought he was unfit for either a class or a broad range of jobs).[12]

Accordingly, defendants' motion for summary judgment as to plaintiffs' ADA claim is GRANTED.

## 2.    Title VII Retaliation Claim

The Magistrate-Judge concluded that, while plaintiffs were able to show that Olivieri had engaged in protected activity, and was subsequently subjected to an adverse employment action, they were unable to establish a causal connection between the protected acts and the adverse employment actions, thereby failing to establish a *prima facie* case of retaliation. Accordingly, the Magistrate-Judge recommended that defendants' motion for summary judgment as to the Title VII retaliation claim be granted. In response, plaintiffs argue that this recommendation was made in error and invite this Court to look into the timing of the events

(continued...)

employers from any inquiry regarding the status of behavior on the part of an employee that an employer may perceive as inappropriate for the employment environment.'") (internal quotation omitted); *Linser v. State of Ohio, Dep't of Mental Health*, No. 99-3887, 2000 WL 1529809, *4 (6th Cir. 2000) ("The fact that Defendants previously granted [plaintiff's] request for accommodation does not by itself establish that Defendants regarded [plaintiff] as disabled."); *Summers v. Middleton & Reutlinger, P.S.C.*, 214 F. Supp.2d 751, 756 (W.D.Ky. 2002) (explaining that the mere fact that the employer attempted to relieve plaintiff's stress does not necessarily mean that the employer regarded her as having a substantially limiting impairment).

[12]    Plaintiffs' attempt to liken the case at bar to *Dangelo v. Conagra Foods, Inc.*, 422 F.3d 1220 (11th Cir. 2005) and *Katz v. City metal Co.*, 87 F.3d 26 (1st Cir. 1996), is unavailing. In *Dangelo* the Court specifically found that the plaintiff's employer had mistakenly determined that she was unable to perform *any* job function available at the plant where she worked. *Dangelo*, 422 F.3d at 1229. Likewise, in *Katz*, the Court pointed to numerous allegations which could have led the jury to conclude that the plaintiff's employer viewed him as disabled under the ADA. *Katz*, 87 F.3d at 33. A similar situation is not present here.

leading up to the implementation of the rotating work schedules and the loss of Olivieri's accommodations.  **Docket No. 49**, at 16.  Plaintiffs do not challenge the Magistrate-Judge's finding that plaintiffs failed to establish a *prima facie* case of retaliation with regards to Olivieri's filing of her E.E.O.C. complaint and her ultimate termination.[13]  Based upon the foregoing, the Court agrees with the Magistrate-Judge's ultimate recommendation, but does so with a slight modification to the analysis under the *McDonnell Douglas* test.

Under the *McDonnell Douglas* analysis, a plaintiff must make a *prima facie* showing of retaliation by presenting evidence that (1) she engaged in protected conduct, (2) she was thereafter subjected to an adverse employment action, and (3) a causal connection existed between the protected conduct and the adverse action.  *See Hernández-Torres v. Intercontinental Trading, Inc.*, 158 F.3d 43, 47 (1st Cir. 1998).  This *prima facie* case of retaliation has been described as a "small showing" that is "not onerous" and is "easily made."  *Kosereis v. Rhode Island*, 331 F.3d 207, 213 (1st Cir. 2003).  Only the third prong of the analysis is in dispute here, therefore the discussion is limited accordingly.[14]

As the law makes clear, "[t]here are many sources of circumstantial evidence that... can demonstrate retaliation in a way sufficient to leap the summary judgment" hurdle.  *Mesnick*

---

[13] To the extent plaintiffs intended to make this argument, it would fail.  First, plaintiffs make no effort – either in their original opposition to the motion for summary judgment, or in the objections to the R&R – to explain how the filing of the E.E.O.C. complaint lead to Olivieri's termination; choosing instead to rely on unsupported speculation.  *See Randlett v. Shalala*, 118 F.3d 857, 862 (1st Cir. 1997) ("[T]he adverse action must have been for the *purpose* of retaliating.  And to defeat summary judgment, a plaintiff must point to *some* evidence of retaliation by a pertinent decisionmaker.").  Second, more than nine (9) months passed between the filing of Olivieri's E.E.O.C. complaint and her termination.  *See, e.g., Dressler v. Daniel*, 315 F.3d 75, 80 (1st Cir. 2003) ("[T]he inference of a causal connection becomes more tenuous with time.").  Third, the record reflects that between the date in which Olivieri filed her E.E.O.C. complaint, and the date she was terminated, defendants made numerous efforts to accommodate her.  **Docket No. 10,** Exh. II,  at ¶ 24-33; *id.* at Exh. II, at Exh. U, X, Y.  Accordingly, as found by the Magistrate-Judge, under these circumstances, no reasonable jury could find a causal connection between Olivieri's termination and the filing of her E.E.O.C. complaint.

[14] The Magistrate-Judge found that the evidence on the record shows several instances where Olivieri engaged in a protected activity, and suffered from adverse employment actions.  **Docket No. 46**, at 26-27.  Since no objections were filed as to these determinations, after conducting a thorough review of the record, the Court adopts these recommendations.

*v. Gen. Elec. Co.,* 950 F.2d 816, 828 (1st Cir. 1991). One way is to show a close temporal proximity between the protected conduct and the adverse employment action. *Wyatt v. City of Boston,* 35 F.3d 13, 16 (1st Cir. 1994). Another is to show "[e]vidence of discriminatory or disparate treatment in the time period between the protected activity and the adverse employment action." *Che v. Mass. Bay Transp. Auth.,* 342 F.3d 31, 38 (1st Cir. 2003) (citing *Kachmar v. Sunguard Data Sys. Inc.,* 109 F.3d 173, 177 (3rd Cir. 1997)). "Once a *prima facie* case of retaliation is established, a presumption of retaliation arises and the *McDonnell-Douglas* burden shifting approach is employed-whereby the defendant has the burden (of production) to articulate a legitimate non-discriminatory reason for the employment decision." *Betancourt-Esquerdo v. Unión Internacional United Auto Workers,* No 03-1189, 2006 WL 2387083, *16 (D.P.R. August 17, 2006) (citing *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973)). If the employer successfully articulates a legitimate non-discriminatory reason for its decision, the burden shifts back to the plaintiff to show pretext and retaliatory animus. *See id.*

The record shows that Olivieri complained to her supervisors about religious discrimination on two separate occasions: on May 23, 2003, when she informed Irizarry that she was being discriminated against by her co-workers (**Docket No. 17**, Exh. 6, at ¶ 16), and again on or about August 15, 2003, when she informed Rivera that someone had tampered with her work (*Id.* at ¶ 18). The record further shows that on August 19, 2003, Olivieri's accommodations were taken away when Abbott required that she once again begin working with chemicals. **Docket No. 21**, Exh. 14. Based upon the closeness of these events, the Court concludes that the "temporal proximity" between Olivieri's allegations of discrimination on May 23, 2003, and August 15, 2003, and her loss of accommodations on August 19, 2003, is sufficient to show a causal connection and therefore meet the relatively light burden of establishing a *prima facie* case of retaliation. *See Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff,* 511 F.3d 216, 224 (1st Cir. 2007); *Pomales v. Celulares Telefónica, Inc.,* 447 F.3d 79, 85 (1st Cir. 2006); *Wyatt v. Boston,* 35 F.3d 13, 16 (1st Cir. 1994).

Since plaintiffs have made a *prima facie* showing of retaliation, the burden shifts to defendants to articulate a legitimate, non-retaliatory reason for their adverse employment

_____

decision. *See, e.g., Mesnick,* 950 F.2d at 827. Defendants, for their part, explain that the reason for the implementation of the rotation schedule was "to promote the most efficient manner for the employees to work in the laboratory and, as such, meet Abbott's changing growing needs." **Docket No. 25**, Exh. IX. Defendants further aver that due to Abbott's growing needs, they were no longer able to limit the raw material/chemical analysis to just the night shift, but had to have it performed all of the time, in both, the day and night shifts, and a rotating schedule was necessary to accomplish this. *Id.* Hence, defendants have *articulated* a legitimate, non-retaliatory justification for the implementation of the rotating schedule, and the loss of Olivieri's accommodations, sufficient to overcome plaintiffs' *prima facie* case of retaliation.

Plaintiffs proffer no evidence that the reasons offered by defendants for their implementation of the rotating schedule and loss of accommodation are pretextual. While plaintiffs engage in speculation and conjecture, that in and of itself is not enough to defeat a properly supported motion for summary judgment. *See Fontánez-Núñez v. Janssen Ortho LLC,* 447 F.3d 50, 55 (D.P.R. 2006) (plaintiff may not rely on "conclusory allegations, or rank speculation" to defeat motion for summary judgment). Instead, plaintiffs needed to make a colorable showing that an adverse action was taken "for the purpose of retaliating" against Olivieri. *Randlett v. Shalala,* 118 F.3d 857, 862 (1st Cir. 1997). As discussed, plaintiffs have not made this showing.[15]

Based on the foregoing, defendants' motion for summary judgment as to plaintiffs' Title VII retaliation claim is GRANTED.

_____

[15] Plaintiffs' attempt to save their retaliation claim by alleging, in a somewhat confusing and conclusory manner, that Abbott withheld medical records, likewise fails. **Docket No. 49**, at 17. First, plaintiffs limit their objection to the Magistrate-Judge's failure to find a causal connection between her complaints about religious harassment in May and August of 2003, and the loss of her accommodation on August 19, 2003. However, the medical evaluations were not alleged to have been withheld until November of 2003. Second, plaintiffs make no effort to explain how defendants' alleged failure to provide the medical evaluations during the interactive process relates to their retaliation claim. Third, while plaintiffs' give the impression that defendants withheld the medical evaluations in an attempt to drive Olivieri out of their employ, the record is replete with evidence of defendants' attempts to work with Olivieri and accommodate her. **Docket No. 10,** Exh. II, at ¶ 24-33; *id.* at Exh. II, at Exhs. U, X, Y.

### 3.      Puerto Rico Law 44

The Magistrate-Judge concluded that since plaintiffs had not raised a genuine issue of material fact with regards to their ADA claim, their Law 44 claim likewise failed.  Plaintiffs' contend that the "record shows and presents more than its share of evidence from which a jury could find in favor of Plaintiff and all the possible inferences and circumstantial evidence lead to a determination that either there are essential facts in controversy or it is clear that Defendants acted in violation of ADA" or Law 44.  **Docket No. 49**, at 17.  This Court disagrees with plaintiffs' contentions.

As plaintiffs correctly concede in their objections, their Law 44 claim must share the same fate as their ADA claim.  *Id.* ("plaintiff agrees . . . [that] Puerto Rico's Law No. 44 claim follows the same criteria as the ADA provision.").  Since, as discussed above and in the R&R, plaintiffs have failed to raise a genuine issue of material fact as to their ADA claim, they likewise fail to raise a genuine issue of material fact as to their Law 44 claim. *See González v. El Dia, Inc.*, 304 F.3d 63, 74 (1st Cir. 2002) (affirming dismissal of contemporaneous Law 44 claim upon dismissal of ADA claim); *Acevedo-Lopez v. Police Dep't of P.R.*, 247 F.3d 26, 29 (1st Cir. 2001) (explaining the Law 44 prohibits employment discrimination on the basis of disability in a similar fashion as does the ADA).

Accordingly, defendants' motion for summary judgment as to plaintiffs' Law 44 claim is GRANTED.

### 4.      Puerto Rico Law 100

After reviewing the record, and the applicable law, plaintiffs' Law 100 claim must fail because they neither alleged that Olivieri's employment was terminated or her accommodations were stripped on account of her religion, nor do they present evidence showing that religious discrimination was a determining factor in any of the adverse employment actions.  In so concluding, the Magistrate-Judge recommended that, absent a presumption of discrimination, and looking at the totality of the circumstances, the claim be dismissed because no reasonable jury could conclude that defendants had violated Law 100.  Plaintiffs counter that the Magistrate-Judge erred in reaching this determination.  However,

instead of laying out the Magistrate-Judge's alleged errors and oversights, plaintiffs merely allege that "there is no doubt that Plaintiffs have more than complied with" the requirement of triggering the presumption of discrimination. **Docket No. 49**, at 18. They then repeat their arguments that Olivieri was clearly regarded as disabled, and that defendants retaliated against her because she complained about the religious harassment. Having scrutinized the record and the extent of plaintiffs' objections, this Court agrees with the Magistrate-Judge.

Law 100, much like Title VII, prohibits, amongst other things, employment discrimination based on religious ideology. *See* 29 L.P.R.A. § 146. The federal and state statutes differ, however, on their respective burden of proof allocation. *See Ramos v. Davis & Geck, Inc.*, 167 F.3d 727, 734 (1st Cir. 1999); *Alvarez-Fonseca v. Pepsi Cola of Puerto Rico Bottling Co.*, 152 F.3d 17, 27 (1st Cir. 1998). Law 100, unlike Title VII, establishes a rebuttable presumption of discrimination unless the employer can demonstrate that the action in dispute was justified. *See Alvarez-Fonseca*, 152 F.3d at 27. In order to dissipate the presumption, the employer carries the burden of establishing that its decision was not based on impermissible criteria. At this stage the defendant's burden is one of persuasion, not of production. *Id.*

"The Law 100 presumption is triggered when a plaintiff presents evidence that some adverse personnel action was taken without 'just cause.'" *Colón-Muriel v. Asociacion de Suscripción Conjunta del Seguro de Responsabilidad Obligatorio,* 499 F.Supp.2d 98, 111 (D.P.R. 2007). Thus, the statute requires that the plaintiff present evidence that the discriminatory actions complained of were taken without just cause, which requires proving the following three elements: (1) an adverse employment action was taken; (2) the action was taken without just cause; and (3) some basic fact substantiating the type of discrimination alleged. *See Dávila v. Corporación de P.R. para la Difusión Pública*, No. 04-2002 (RLA), 2006 WL 2092570 (D.P.R. July 26, 2006), *affd.* 498 F.3d 9 (1st Cir. 2007); *Colon-Muriel*, 499 F.Supp.2d at 111; *Díaz Fontánez v. Wyndham Hotel Corp.*, 155 D.P.R. 364 (2001). Once the plaintiff is able to show that the adverse employment action was unjust, the burden shifts back to the defendant to prove, by a preponderance of the evidence, that the challenged action was not motivated by discriminatory animus. *Alvarez-Fonseca*, 152 F.3d at 28. If the defendant is able to prove that

the decision that constituted the adverse employment action was justified, the presumption disappears and "the burden of proof on the ultimate issue of discrimination remains with plaintiff." *Id.*

Here, as explained by the Magistrate-Judge, plaintiffs fall short of triggering the initial presumption of discrimination.  For starters, plaintiffs neither allege, nor do they provide, factual evidence to support a finding that Olivieri suffered an adverse employment action *because* of her religious ideologies, as required by Law 100.  *See* 29 L.P.R.A. § 146 ("Any employer who . . . discriminates against an employee . . . because of his/her . . . religious ideology . . . shall incur in civil liability.").  In fact, plaintiffs claim that Abbott took adverse employment actions against Olivieri because she *complained* about being harassed, not *because* of her religious ideology.  *See, e.g.*, **Docket No. 1**, at ¶¶ 47-48; **Docket No. 49**, at 19.  At best, plaintiffs allege that Abbott used Olivieri's religious affiliation and beliefs to try and pressure her to leave her job (**Docket No. 1**, at ¶ 48), but provide no factual support for this allegation. *See Diaz v. Wyndham Hotel Corp.*, 155 D.P.R. 364 (2001) (explaining that "the mere allegation of a basic fact, without having been duly established, does not activate a presumption that permits the inference of a presumed fact"); *Meléndez v. SAP Andina y del Caribe*, 518 F. Supp.2d 344 (D.P.R. 2007) (explaining that plaintiff's subjective and conclusory belief that he suffered an adverse employment action as a result of discrimination is not enough proof of an unjustified adverse action).  To the contrary, the record shows that Abbott took Olivieri's claims very seriously, and went out of its way to conduct exhaustive investigations into them. For example, at one point Abbott even sought external assistance in an attempt to remedy Oliveri's problems.  **Docket No. 10**, Exh. II, at ¶¶ 11-15; Exh. I-T.  Moreover, Abbott repeatedly attempted to work with Olivieri, and find alternative positions for her within the company, but Olivieri rebuffed all such efforts.  **Docket No. 10**, Exh. II, at ¶¶ 24-35; Exh. II, at exhs. V, W, X, Y; **Docket No. 17**, at Exh. 29.  While Olivieri may have been unhappy with the positions proposed by Abbott, she made no attempt to work with Abbott and secure a position she deemed worthy, choosing instead to avoid Abbott all together.  **Docket No. 10**, Exh. II, at ¶ 35; **Docket No. 17**, Exh. 32.  Finally, plaintiffs fail to set forth any facts showing

religious discrimination as a determining factor in taking away Olivieri's accommodations or in terminating her.  Consequently, absent the presumptive effect of Law 100, the Court does not find the necessary support for plaintiffs' religious discrimination claims when considering the totality of the circumstances under which the challenged personnel decisions were made.

Based on the foregoing, defendants' motion for summary judgment as to plaintiffs' Law 100 claim for Olivieri's termination and/or the discontinuance of her "accommodation" based upon discriminatory animus is GRANTED.[16]

### 5.    Puerto Rico Law 80

In recommending that plaintiffs' Law 80 claim be dismissed, the Magistrate-Judge explained that contrary to plaintiffs' contentions, Olivieri's termination occurred after a long drawn-out process of Abbott trying to accommodate Olivieri, but without substantial cooperation from Olivieri herself.  Further, despite Abbott's explanation for its decision to terminate Olivieri, namely, Olivieri's extended absence from work, plaintiffs failed to point to any facts which create a genuine factual issue as to Abbott's justification for its decision. Plaintiffs contend that the Magistrate-Judge erred in his recommendation because the alternative positions offered to Olivieri, and relied on by the Magistrate-Judge, were in fact demotions because they were not guaranteed, were for lesser pay, and she had to apply like all candidates.[17]  Accordingly, Olivieri contends that since she was neither allowed to return

---

[16] As previously explained, *see supra* n.8, plaintiffs' hostile work environment claim under Law 100 survives summary judgment.

[17] Plaintiffs objection to the Law 80 claim, besides the text from the opposition to summary judgment filing, is limited to the following:

> As Mrs. Olivieri indicated these new positions, which she had to apply like any other candidate (in clear violation of ADA reasonable accommodation standard) also these new positions constituted a demotion and decrease in salary. As Mrs. Olivieri was not allowed to return to the position she held interruptively since 1999 and was forced out of the Chemical Lab with the use of false medical evidence it is evident that a cause of action under Law 80 is present and must be enforced.

*Id.*

---

to her job as a Laboratory Technician III, nor offered a position of equal stature and pay, she was constructively discharged.  This Court understands that the evidence on record defeats plaintiffs' allegations.

Law 80  provides that every employee in commerce, industry or any other business or place of employment, who is discharged from his employment without good cause, shall be entitled to receive from his employer, in addition to the salary he may have earned, the salary corresponding to one month, as indemnity, and an additional progressive indemnity equivalent to one week for each year of service. *See* 29 L.P.R.A. § 185a. "Section 185b of Law 80 gives examples of good cause for termination and further provides that a termination which is 'made by the mere whim of the employer or without cause relative to the proper and normal operation of the establishment' is not a termination for good cause." *Velázquez-Fernández v. NCE Foods, Inc.*, 405 F. Supp.2d 179, 192 (D.P.R 2005) (citing 29 L.P.R.A. § 185a).

The record clearly shows that the decision to terminate Olivieri's employment was not made on a mere whim in violation of Law 80.  The uncontested facts reveal that Olivieri left Abbott in early September of 2003 and never returned to work. **Docket No. 10-3**, at 71-76. Once the one (1) year of reserve passed without Olivieri returning to work, Abbott no longer had a legal obligation to hold her position. *See* Act No. 139 of June 26 1968, 11 L.P.R.A. § 201 *et seq.*  Further, as discussed above, on numerous occasions during this period, Abbott attempted to accommodate Olivieri, but received little cooperation from her.  Consequently, Abbott terminated Olivieri on September 2, 2004, one (1) year after Olivieri had last worked for Abbott.  As such, Abbott acted within the guidelines of Law No. 80, and had just cause for her dismissal. *See, e.g., González-Villanueva v. Warner Lambert*, 339 F. Supp.2d 351, 361 (D.P.R. 2004).

Plaintiffs' constructive discharge claim also fails.  While Law 80 recognizes a cause of action for constructive discharge, the facts of this case do not support such a finding.  First, as the record shows, Olivieri never resigned her position, but was instead terminated. *See* 29

L.P.R.A. § 185e.[18] Second, the record shows that Abbott attempted to work with Olivieri prior to her termination. **Docket No. 17**, Exh. 29 (letter from Bayron, dated January 20, 2004, inviting Olivieri to meet and discuss alternative positions within Abbott). Third, Olivieri failed to work with Abbott in reaching an accommodation, even after they pleaded with her to do so. **Docket No. 10**, Exh. II, at Exh. W (letter from Bayron, dated February 17, 2004, explaining that Abbott presented two available positions, both of which were turned down by Olivieri); Exh. X (letter from Bayron, dated March 9, 2004, urging Olivieri to talk to her doctor about possible accommodations so that she could either return to her technician position); Exh. Y (letter from Bayron, dated September 2, 2004, pointing out Oliveri's failure to take part in the "interactive" process); **Docket No. 10**, Exh. II, at ¶¶ 26-28 (explaining that Olivieri failed to show up at two meetings to discuss alternative positions); *id.* at ¶¶ 32, 33 (Olivieri refused to visit the Human Resources Department to investigate open positions, despite being invited to do so). Fourth, plaintiffs fail to point to any admissible evidence to support their contention that Olivieri was constructively discharged, relying instead on blanket and conclusory statements. **Docket No. 49**, at 20-21. As the law makes clear, where good cause for an employee's termination is shown, summary judgment in favor of the employer is appropriate. *Velázquez-Fernández*, 405 F. Supp.2d at 192-93.

Accordingly, defendants' motion for summary judgment as to plaintiffs' Law 80 claim is GRANTED.

### 6.     Articles 1802 & 1803 Claims

Finally, to the extent the hostile work environment claim under Law 100 survived, the Magistrate-Judge recommended granting in part and denying in part defendants' summary

---

[18] Section 185e defines discharge under section 185a as:

For the purposes of §§ 185a-185l of this title, discharge shall be understood to be, besides the employee's layoff, his suspension indefinitely or for a term over three (3) months, except in the case of employees of seasonal industries or businesses or the **resignation** of the employee caused by the actions of the employer directed to induce or compel him to resign . . . .

29 L.P.R.A.  § 185e (emphasis added).

judgment with regards to the Article 1802 and 1803 claims.  Plaintiffs contend that the Magistrate-Judge erred in dismissing these claims inasmuch as he erroneously recommended that the underlying Law 100 discrimination claim be dismissed.  This Court agrees with the Magistrate-Judge.

Plaintiffs' Article 1802 and 1803 claims are derivative of their Law 100 claims.  Having denied defendants' motion for summary judgment on plaintiffs' hostile work environment claim under Law 100, the Court declines to dismiss plaintiffs' Article 1802 and 1803 cause of action as to that claim.  However, the Court dismisses it with regards to all other claims. *See Santini-Rivera v. Serv Air, Inc.*, 137 D.P.R. 1 (1994) (holding that the employee's parents and girlfriend have a derivative cause of action under Article 1802 for the employer's violation of Law 100); *Maldonado Rodriguez v. Banco Central Corp.*, 138 D.P.R. 268 (1995) (same).

Consequently, defendants' motion for summary judgment as to plaintiffs' Article 1802 and 1803 claims is GRANTED in part and DENIED in part.

**VI.    Conclusion**

After considering the parties' objections, pleadings on record, and the R&R, the Court hereby **ADOPTS** the R&R now before the Court (**Docket Nos. 46**).  Accordingly, defendants' motion for summary judgment (**Docket Nos. 10**) is hereby **GRANTED** in part and **DENIED** in part.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 17th day of March, 2008.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**